UNITED STATES of America,

v.

Dominick NAPOLITANO, a/k/a "Sonny Black," Benjamin Ruggiero, a/k/a "Lefty," John Cerasani, a/k/a "Boobie," Nicholas Santora, a/k/a "Nicky," James Episcopia, a/k/a "Jimmy Legs," and Antonio J. Tomasulo, a/k/a "Boots," Defendants.

No. 81 Cr. 803 (RWS).

United States District Court,
S.D. New York.

Jan. 19, 1982.

On Motion to Reduce Bail
March 27, 1982.

On Motion to Dismiss Indictment
May 18, 1982.

On Motion to Suppress
June 10, 1982.

On Motion for Severance
June 25, 1982.

On Motion to Dismiss and to Reduce Bail
July 7, 1982.

On Motion to Prohibit Trial In Absentia
July 15, 1982.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for U.S.; Barbara S. Jones, Asst. U.S. Atty., New York City, of counsel.

Robert Koppelman, New York City, for defendant Ruggiero.

David Breitbart, New York City, for defendant Cerasani.

Lewis Cohen, Brooklyn, N.Y., for defendant Santora.

Irwin Klein, New York City, for defendant Tomasulo.

Meyer, Light, London & Lopez, Brooklyn, N.Y., for defendant Episcopia; Frank A. Lopez, Brooklyn, N.Y., of counsel.

Paul P. Rao, Jr., New York City, for defendant Rabito.

Joseph Klempner, New York City, for defendant Mulligan.

Barry Slotnick, New York City, for defendant Piteo.

## OPINION

SWEET, District Judge.

The government moves for a deferral of discovery and a Speedy Trial Act continuance pursuant to the interest of justice provision, 18 U.S.C. § 3161(h)(8)(A). This is a six defendant, two count indictment charging violations of the Rico Statute, 18 U.S.C. § 1962(c) & (d). The pattern of racketeering in the conspiracy and substantive counts is based on allegations of murder, armed robbery, narcotics, and gambling.

The procedural history relevant to this application starts with the arrest of defendant Ruggiero on August 29, 1981. On September 9, 1981, pursuant to 18 U.S.C. § 3161(h)(8), the government applied for and received a thirty day continuance, thereby postponing the date for a preliminary hearing or indictment. The government cited to the complex nature of the case, the need to protect an ongoing undercover investigation, and the extensive evidence, including electronic surveillance, which required analysis prior to indictment. On October 8, 1981, the government applied for and received an additional forty-five day delay of the date for a preliminary hearing or indictment on essentially the same basis as the initial motion and in addition, on the need to procure grants of

immunity from Washington for several grand jury witnesses and to coordinate with investigations in the Southern District of Florida.

On November 23, 1981, the defendants were indicted. A pretrial conference was held on December 3, 1981, at which time it was determined that the government would complete its voluntary discovery by January 5, 1982, at which time another pretrial conference would be held, and a schedule for defense motions and trial would be fixed. On December 28, 1981, the government filed a notice of motion to submit a statement ex parte for the purpose of a deferral of discovery and a Speedy Trial Act continuance. On January 5, 1982, this court permitted the submission of an ex parte affidavit, which details the progress of the investigation underlying this case. Attached to this affidavit were the two prior ex parte affidavits which had been submitted by the government to obtain the two pre-indictment continuances totalling seventy-five days.

In essence, the government seeks to defer discovery of certain body consent tapes, Title III recorded statements, and videotaping relating to the Florida proceedings as well as to this action until January 31, 1982, for purposes of coordination. Additionally, the government seeks to defer discovery of certain other Title III interceptions for ninety days. The government again cites the unusual and complex nature of the action, the requirements of coordinating with proceedings in Florida and the real possibility that these matters may result in a superseding indictment. It is appropriate to consider these factors in light of 18 U.S.C. § 3161(h)(8) and the particular facts presented.

Section 3161(h)(8)(A) provides that a judge may grant a "continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." Whether injustice would result from the failure to grant a continuance, whether the case is so complex due to the nature of the prosecution, and

whether effective preparation would be denied by the failure to grant a continuance, are all factors to be considered in deciding the government's motion. 18 U.S.C. § 3161(h)(8)(B).

■ The government's request to withhold the material based on the Florida investigation is granted. In view of the severity of the charges and the complexities of coordinating investigations, the interest of justice requires that the government be granted a deferral of this discovery until January 31, 1982. This time will be excluded under the Speedy Trial Act, 18 U.S.C. § 3161(h)(8).

The government's request for the deferral of discovery relating to certain additional interceptions warrants separate consideration. Despite the complexity of the evidence and the lengthy undercover investigations requiring detailed analysis and presentation, the material is not new and indeed, has formed the basis of the government's second request for a pre-indictment continuance of forty-five days.

To deny the continuance would mandate disclosure of materials which would impede an ongoing significant investigation. Confronted with a similar, but less complicated situation in *United States v. Mannino,* 480 F.Supp. 1182, 1188 (S.D.N.Y.1979), this court granted the government's request to permit a comprehensive analysis of evidence betokening serious criminal charges, recognizing a public interest in such an analysis. Requiring the government either to disclose the materials, thereby adversely impacting on its present investigation, or to dismiss the current indictment and to reindict would jeopardize this interest, which predominates in this situation over the public's interest in prompt disposition of criminal cases and over defendants' interest in obtaining a speedy trial.

In light of these findings, I conclude that the ends of justice served by a continuance outweigh other interests protected by the Act. *See United States v. Fielding,* 645 F.2d 719, 721–22 (9th Cir.1981). Therefore, the government's request to defer discovery of this additional material is granted to the extent that it may be withheld until February 24, 1982.

A pretrial conference will be held on February 24, 1982 at 4:30 p.m. in courtroom 302.

IT IS SO ORDERED.

## ON MOTION TO REDUCE BAIL

■ The February 24, 1982 letter of counsel having been treated as a motion to reduce bail previously set for defendant Benjamin Ruggiero ("Ruggiero") is denied.

Ruggiero was arrested on August 29, 1981. According to his counsel, Ruggiero had been advised some time previously by an undercover agent that serious charges would be brought against him. An indictment charging him with a pattern of racketeering in violation of 18 U.S.C. § 1962 was filed on November 23, 1981. For reasons previously set forth, the time for discovery, pretrial motions and the trial have been extended. These motions will be heard on April 30 and May 28, 1982, and it is hoped that the trial can be set within a month of the disposition of the anticipated motions. Clearly the case is complicated, and the evidence is claimed by the Government to be extensive. Ruggiero is also under indictment in Milwaukee for racketeering in violation of 18 U.S.C. § 1951. Although there may be some evidentiary overlap on the New York and Milwaukee cases, except as set forth below, the decisions relating to the instant case have been made independently of the other proceedings in which Ruggiero may be involved.

On December 3, 1981, after the action had been assigned to me, an application was made to reduce the bail which was granted, and bail was fixed in New York at $150,000 cash or surety. Bail in Milwaukee remained at $150,000 cash or surety. Thereafter Ruggiero sought certain medical treatment which gave rise to a number of applications which included requests to reduce bail which were denied.

Then after consultation with the District Court of the Eastern District of Wisconsin, bail conditions were modified to $200,000

personal recognizance bond in Milwaukee and $200,000 cash or surety in New York.

Ruggiero asserts a stable family, the need for continuing medical care, the opportunity for employment, and the ability to prepare his defense as the principal reasons for eliminating the cash or surety provisions of the current bail. He points out without contradiction from the Government that despite knowledge of the pendency of these charges he did not flee the jurisdiction though he had ample opportunity to do so.

The Government in opposing the application points out the seriousness of the charges, the pendency of other serious charges elsewhere, and notes the absence of Dominick Napolitano, who is currently a fugitive to underscore the possibility of such a course of action. The Government also places heavy emphasis on its information that Ruggiero is the subject of a "contract" and that he would be killed if released on bail. Assuming the information concerning the threat to Ruggiero's life to be accurate, I decline to reach the question whether or not to deny bail in order to insure his presence at trial in the face of these alleged threats. The information is, of course, relevant on the question of flight, and it is for that reason that knowledge of this threat is advanced by the Government.

Obviously, decisions as to the amount and form of bail are difficult and discretionary, dealing as they do with past conduct and present conditions as predictors of future behavior. Of course, this difficulty is deepened by the duration of the denial of liberty which has resulted here as an unhappy consequence of the complicated nature of this proceeding. Nor can I completely disregard the fact that certain of the other defendants have posted substantial bail. However, though obviously interrelated, the criteria for these various decisions regarding bail and the setting of trial schedules must be kept separate.

With all the circumstances in mind and considering principally the severity of the charges and the possible consequences, I decline to grant the motion to reduce bail.

IT IS SO ORDERED.

## ON MOTION TO DISMISS INDICTMENT

Defendant James Episcopia ("Episcopia") moves pursuant to Rule 12(b) Fed.R.Cr.P. to dismiss counts one and four of the indictment alleging violations of 18 U.S.C. § 1962(d) and 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A). For the following reasons, the motion is denied.

■ In moving to dismiss count one, Episcopia contends that the indictment failed to establish that the Bonanno Family of La Cosa Nostra is an enterprise within the meaning of 18 U.S.C. § 1962 or that Episcopia was a member of the enterprise. In considering a motion to dismiss a count in an indictment, the allegations must be accepted as true. *United States v. Whalen,* 337 F.Supp. 1012, 1017 (S.D.N.Y.1972); *accord United States v. Gulf Oil Corp.,* 408 F.Supp. 450, 462 (W.D.Pa.1975). Rule 12(b) Fed.R.Cr.P. pertains to requests which are "capable of determination without the trial of the general issue." No attack has been made upon the indictment as being insufficient in law in this regard. The issues raised by Episcopia with regard to count one must therefore be deferred until the trial of this case on the merits. Rule 12(e), Fed.R.Cr.P., *see United States v. Callahan,* 300 F.Supp. 519, 522 (S.D.N.Y.1969); *United States v. Fargas,* 267 F.Supp. 452, 455 (S.D.N.Y.1967).

■ Additionally, Episcopia contends that because count four of the indictment charges him with a conspiracy to distribute quaaludes in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and because count one lists this conduct as a predicate offense, the indictment places him in double jeopardy. However, the Second Circuit has held that separate convictions and sentences may be determined for "a RICO offense and the underlying or predicate crimes which make up the racketeering pattern." *United States v. Boylan,* 620 F.2d 359, 361 (2d Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980).

Therefore, Episcopia's motions to dismiss counts one and four of the indictment are denied.

IT IS SO ORDERED.

## ON MOTIONS TO SUPPRESS

Numerous substantive motions have been filed in this action involving eleven defendants. The indictment charges violations of the RICO statute, 18 U.S.C. §§ 1962(c) & (d) as well as possession and distribution of quaaludes in violation of 21 U.S.C. §§ 812, 841(a)(1) & 841(b)(1)(A) and 18 U.S.C. § 2, and conspiracy in violation of 21 U.S.C. § 846. Each motion will be dealt with separately.

Defendants move pursuant to 18 U.S.C. § 2518(10)(a) and Rules 12(b)(3) and 41(f) Fed.R.Cr.P. to suppress the evidence obtained by means of electronic surveillance and eavesdropping. For the reasons set forth below this motion is denied. Additionally the defendants assert that the government has failed to comply with the minimization requirements of 18 U.S.C. § 2518(5) and defendants request a hearing on this issue which request will be granted in accordance with this memorandum opinion.

Defendants challenge sufficiency of the government's application for electronic surveillance and its allegation of particularized need and probable cause for the surveillance. Section 2518(1)(c) mandates that

a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c). In interpreting this statute the Supreme Court has stated that this provision "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153, 94 S.Ct. 977, 983, 39 L.Ed.2d 225 (1974).

In formulating standards to determine whether the government's application for electronic surveillance is sufficient to indicate the inadequacy of other investigative

techniques, the Second Circuit has realized the difficulty in providing specifics "[when] one endeavors to prove a negative." United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir.1975) (other means unlikely to reveal the scope of the operation is sufficient), cert. denied, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). Consequently it has refused "to set impossibly burdensome standards." Id.

In reviewing alleged violations of wiretap orders issued pursuant to N.Y.Crim. Proc.Law §§ 700.15(4) and 700.20(2) (McKinney), which the court has noted is equivalent to the federal wiretap statute at issue here 18 U.S.C. § 2518(1)(c), United States v. Fury, 554 F.2d 522, 529 n. 6 (2d Cir.1977), cert. denied, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); United States v. Hinton, 543 F.2d 1002, 1011 (2d Cir.1976), cert. denied, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 783 (1977), the Second Circuit has held that the purpose of the requirements "is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents." United States v. Hinton, 543 F.2d at 1011; see United States v. Fury, 554 F.2d at 530. In order to satisfy the statute the application for electronic surveillance must inform the court of the " 'nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.' " United States v. Scafidi, 564 F.2d 633, 641 (2d Cir.1977), (quoting United States v. Hinton, 543 F.2d at 1011), cert. denied, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978).

Moreover this Circuit has adopted the standard as set forth in the legislative history of the statute that the "required showing is to 'be tested in a practical and common sense fashion.' " United States v. Fury, 554 F.2d at 530 (quoting S.Rep. No. 1097, 90th Cong.2d Sess., reprinted in [1968] U.S.Code Cong. & Ad.News 2112, 2190). This "commonsense" approach is consistent with the reasonableness standard which states that

an affidavit is not insufficient because it did not prove beyond a shadow of a doubt

that ordinary techniques will fail or that their use will result in a loss of life or some equivalent disaster. The standard of reasonableness should be employed in measuring the affidavit against the statutory requirements.

*United States v. Spagnuolo,* 549 F.2d 705, 710 (9th Cir.1977), *see United States v. Hyde,* 574 F.2d 856, 867 (5th Cir.1978); *United States v. Daly,* 535 F.2d 434, 438 (8th Cir.1976); *United States v. DePalma,* 461 F.Supp. 800, 812–14 (S.D.N.Y.1978); *United States v. Baker,* 443 F.Supp. 526, 529 (S.D.N.Y.1977).

The electronic surveillance orders are therefore measured under these standards and against the scope and complexity of the investigation being undertaken. Here at the outset the investigation involved over six years of undercover activities by the FBI in connection with unlawful activities conducted by members of organized crime associations throughout the United States. Particularly, agents of the FBI are alleged to have infiltrated one of the criminal enterprises and have gathered information of among other things, gambling, bookmaking and loansharking operations, distribution of stolen goods and narcotics and several murders.

The affidavits submitted with each application state that "[n]ormal investigative techniques have been discounted" because confidential informants have limited contact with the subjects of the investigation, are not in a position to gain direct material knowledge of the activities of the criminal enterprise and will not testify concerning the investigation. Physical surveillances as well as pen registers and subscriber information corroborate the whereabouts of individuals but could not establish elements of the criminal activity. Additionally, the homogeneous neighborhood in which limited physical surveillance occurred render it likely that subjects of the investigation would become aware that their activities were being investigated. Confidential sources indicated defendants' suspicions concerning surveillance. Moreover, the broad scope and insulated nature of the criminal enterprise under investigation tended to establish that the undercover agent who operated primarily in Florida,[1] would not be able to obtain sufficient evidence to establish the scope of the New York based criminal activity. No further investigation by undercover agents concerning the alleged murders were planned due to risks to the safety of the special agents. Finally, search warrants, investigative grand juries and interviews of the subjects would result in publicity and the termination of the investigation.

In light of the information supplied in the affidavits, I conclude that the government has satisfied the statutory requirements of 18 U.S.C. § 2518(1)(c) to set forth the need for electronic surveillance.

The defendants also move to suppress the electronic surveillance on the grounds that the government had failed to establish probable cause concerning the Rabito, Ruggiero, and Motion Lounge telephones and the Motion Lounge tap. A review of the affidavits indicates that this motion is meritless. An undercover FBI agent's penetration into the criminal enterprise forms the basis of government's recitation of facts sufficient to establish probable cause for the electronic surveillance orders.

■ With regard to the Loar affidavit concerning the Motion Lounge wiretap and bug, the undercover agent observed criminal activities at the Motion Lounge and Capri Car Service, communicated with the subjects of the investigation by calling

---

1. At oral argument defendant Ruggiero challenged the factual allegation that the undercover agent operated primarily in Florida and argued that the agent lived in New York in close proximity to one of the premises being tapped and that the tapping was therefore unnecessary. The government responded that as asserted in the government's affidavits, the agent was located principally in Florida during the relevant period and that when in New York he stayed with defendant Napolitano, but he was not privy to the criminal activities at Napolitano's level. Defense counsel have cited no facts to challenge the role, location and sufficiency of the agent's investigation as set forth in the affidavit to warrant a hearing with respect to the agent's ability to obtain evidence without the electronic interceptions.

them at the telephones at these premises to report "illegal" activities, and received information, corroborated by physical surveillances and pen registers, that these were two telephones used for illegal "business" activities.

■ With regard to the Siracusa affidavit concerning the Rabito wiretap, the information supplied by an informant was corroborated by the undercover agent's findings and by physical surveillances and pen registers. The informant's data meets the standards announced in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The affidavit satisfies the requirements that the informant's past record indicates reliability and credibility and that the informant's knowledge resulted from personal experiences. For some six years, the informant has provided information to the FBI concerning participants in organized crime in New York. During this time the FBI has independently corroborated this data. Additionally, he provided information which resulted in the arrest of fifteen persons, the convictions of ten, and the recovery of over $4,000,000 in stolen property. The informant is a criminal associate of the targets of the investigation, who was personally told by them that they used Rabito as a conduit and could be contacted at certain times by calling Rabito's phone. Moreover, the subjects of the investigation also told the informant that Rabito used the telephone in reporting his criminal activities to them.

With regard to the Waltz affidavit concerning the Ruggiero telephone, the undercover agent was given this number by Ruggiero so that they could discuss the progress of the illegal activities. Pen registers also corroborated that Ruggiero's phone was used in making calls to the Motion Lounge.

This sampling of the material attested to in the affidavits, which was primarily supplied by an FBI undercover agent, is sufficient to establish probable cause to believe that the subjects named were involved in criminal activities and that criminal conversations related to these activities would occur over the wires.

■ In addition, to satisfy the statutory requirements to institute electronic surveillance, wiretapping and electronic surveillance must "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5); *see Scott v. United States,* 436 U.S. 128, 130, 98 S.Ct. 1717, 1719, 56 L.Ed.2d 168 (1978); *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). A determination as to whether minimization has been complied with requires an assessment of the reasonableness of the interceptions in light of the purpose of the wiretap and the totality of the circumstances of each case. *Scott v. United States,* 436 U.S. at 131, 139–40, 98 S.Ct. at 1720, 1724–25. Factors to be considered include the scope of the conspiracy, duration and nature of the conversation, pattern of calls, stage of surveillance, and percentage of non-pertinent calls. *Id.* at 140–142, 98 S.Ct. at 1724–25. In an investigation which focuses on a "widespread conspiracy," more extensive surveillance is permitted. Minimization may be rendered impossible during short or ambiguous calls. Greater leeway is permitted during interception of non-pertinent conversations at the early stages of surveillance when agents have not been able to establish patterns of conversations. Interception may be reasonable when the percentage of non-pertinent calls (60%) is high. *Id.*

■ The government has the burden of proof in the first instance to show that surveillance was reasonable. *United States v. Rizzo,* 491 F.2d 215, 217 (2d Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974). The affidavits, periodic reports and daily logs which have been submitted to and reviewed by this court indicate that the government has established a prima facie showing of compliance with minimization standards. *United States v. Cirillo,* 499 F.2d 872, 880–81 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974). The defendants have to

date failed to provide specific instances to challenge the government's submission. In light of the absence of any evidence of unreasonable interception, defendants were directed at oral argument on May 28, 1982 to specify their objections within ten (10) days and none such have been set forth, although defendant Ruggiero alleged that certain conversations were intercepted in violation of the marital privilege. In the event that particular interceptions are challenged and specified in writing within five (5) days, a hearing will be conducted.

IT IS SO ORDERED.

## ON MOTIONS FOR SEVERANCE

Numerous motions have been filed by the defendants and the government in this criminal action involving eleven defendants, Dominick Napolitano ("Napolitano"), Benjamin Ruggiero ("Ruggiero"), Joseph Messina ("Messina"), Anthony Rabito ("Rabito"), Nicholas Santora ("Santora"), James Episcopia ("Episcopia"), Antonio Tomasulo ("Tomasulo"), John Cerasani ("Cerasani"), Dennis Mulligan ("Mulligan"), Vincent Lopez ("Lopez") and Vincent Piteo ("Piteo"). The four count indictment charges conspiracy to violate the RICO statute, 18 U.S.C. § 1962(c), substantive violations of the same statute, 18 U.S.C. § 1962(d), possession and distribution of quaaludes in violation of 21 U.S.C. §§ 812, 841(a)(1) & 841(b)(1)(A) and 18 U.S.C. § 2, and conspiracy in violation of 21 U.S.C. § 846. All

defendants have joined in the motions of co-defendants whenever applicable. Each motion will be dealt with separately.

*Severance*

Defendants move for severances and for separate trials pursuant to Rules 8 and 14 Fed.R.Crim.P. These motions are denied. The indictment charges that each defendant was a member or associate of a criminal enterprise, the Bonanno Family of La Cosa Nostra, which engaged in various criminal activities constituting a pattern of racketeering.

Specifically, count 1 alleges that each defendant conspired to conduct and participate in the enterprise's activities through a pattern of racketeering in violation of 18 U.S.C. § 1962(d). The pattern of racketeering claimed to be the subject of the conspiracy alleges 13 instances of criminal activities including four murders,[1] two thefts from interstate commerce,[2] four robberies,[3] two narcotics offenses,[4] and gambling.[5]

Count 2 charges six defendants[6] pursuant to 18 U.S.C. § 1962(c) with substantive violations relating to the charges in count 1, including the murders, the thefts from interstate commerce, one of the robberies, the two narcotics offenses and the gambling. Count 3 charges three defendants[7] with possession and distribution of methaqualone in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2. Count 4 charges three defendants[8]

---

**1.** Six defendants are named in Count 1 concerning the murders: Napolitano, Ruggiero, Messina, Rabito, Santora and Episcopia.

**2.** Four defendants are named with regard to the truck theft of tuna fish: Napolitano, Messina, Cerasani and Piteo. Three of these, Napolitano, Messina and Cerasani, are also named with regard to the truck theft of a clothing trailer.

**3.** Five defendants are named concerning the robbery of the apartment of the Shah of Iran's sister: Napolitano, Cerasani, Mulligan, Lopez and Piteo. Two defendants, Episcopia and Mulligan are named with regard to the robbery of the Landmark Union Trust Bank. Four defendants are named with regard to the robbery of the Pan Am Credit Union: Napolitano, Cerasani, Mulligan and Lopez. Five defendants are named with regard to the robbery of the

Galerie Des Monnaies: Napolitano, Santora, Cerasani, Mulligan and Lopez.

**4.** Four defendants are named with regard to narcotics: Napolitano, Cerasani, Santora and Tomasulo. Additionally Santora and two other defendants, Rabito and Episcopia are named concerning a second narcotics violation.

**5.** Four defendants are named with regard to illegal gambling: Napolitano, Cerasani, Santora and Tomasulo.

**6.** Napolitano, Ruggiero, Messina, Santora, Cerasani and Piteo.

**7.** Rabito, Episcopia and Santora.

**8.** Rabito, Episcopia and Santora.

with conspiracy to distribute and to possess with intent to distribute methaqualone in violation of 21 U.S.C. § 846. The narcotics charges in counts 3 and 4 form the basis of one narcotics transaction included in the pattern of racketeering in count 1. Thus the crimes charged in counts 2, 3 and 4 all relate to the criminal activity charged in count 1. As more fully set forth below, the charge that each defendant conspired to participate in diverse criminal activities and associated to commit these activities as part of a criminal enterprise is sufficient to deny defendants' motions for severance and separate trials.

In *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), the Supreme Court delineated the requisites for proving a RICO violation. In order to secure a conviction under RICO, the government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.' The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1) (1976 ed., Supp. III). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise.

■ In the instant case, the indictment charges the existence of an enterprise, the Bonanno Family of La Cosa Nostra, a group of persons including the defendants, associated together for a common purpose of engaging in a course of conduct. Additionally, the indictment charges a pattern of racketeering, a series of criminal acts engaged in by the defendants. Each defendant is charged with participating in the affairs of the enterprise through a conspiracy involving the commission of at least two predicate criminal acts. *See United*

*States v. Welch,* 656 F.2d 1039, 1050 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982); *United States v. Bright,* 630 F.2d 804, 812–13 (5th Cir.1980). The only relationship which must be established among the predicate acts is that they be conducted on behalf of the same enterprise. *United States v. De-Palma,* 461 F.Supp. 778, 782 (S.D.N.Y.1978), *aff'd sub nom. United States v. Weisman,* 624 F.2d 1118 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). The indictment fulfills this requirement in count 1 by naming all the defendants as participants in a conspiracy of the enterprise to engage in a pattern of racketeering. The scheme charged in count 1 provides the nexus linking the activities of the various defendants who are charged in counts 2, 3 and 4.

■ Defendants challenge joinder under Rules 8 and 14 Fed.R.Crim.P. Both joinder and severance are left to the discretion of the trial court. *United States v. Herrera,* 584 F.2d 1137, 1143 (2d Cir.1978); *United States v. Moten,* 564 F.2d 620, 628 (2d Cir. 1977), *cert. denied,* 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977).

Rule 8(b) provides for joinder of defendants "if they are alleged to have participated ... in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

■ The indictment charges a pattern of racketeering which comprises a "series of acts or transactions" under Rule 8(b). Acts arising out of a common scheme or plan, or for present purposes on behalf of the enterprise, may be joined. *United States v. Weisman,* 624 F.2d 1118, 1129 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *United States v. Ricco,* 549 F.2d 264, 271 (2d Cir.), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977); *United States v. Clemente,* 494 F.Supp. 1310, 1324 (S.D.N.Y.1980).

■ As mentioned above, all defendants are charged in count 1; six defendants are charged in count 2 with violations which stem from the conspiracy described in count 1; three defendants are charged in counts 3 and 4 with violations which relate to counts 1 and 2. Rule 8 does not require all defendants to be charged in all counts of the indictment. *United States v. Barton,* 647 F.2d 224, 239–40 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). Joinder is proper when as here all defendants are alleged to have participated in an overall scheme as associates in a criminal enterprise. *Id.; see United States v. Borelli,* 336 F.2d 376, 387 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Thus Rule 8 joinder requirements have been satisfied.

■ Finally the defendants argue that they will be prejudiced by joinder of offenses and seek severance pursuant to Rule 14 Fed.R.Crim.P. However, the Second Circuit has held that "[p]ersons accused in one indictment of joint participation in a crime are normally tried together, absent a showing of substantial prejudice, as to which the defendants bear a heavy burden." *United States v. Lord,* 565 F.2d 831, 839 (2d Cir.1977); *see United States v. Rucker,* 586 P.2d 899, 908 (2d Cir.1978). The burden is not met by showing that defendants "might have had a better chance of acquittal by being separately tried." *United States v. Cassino,* 467 F.2d 610, 623 & nn. 37–39 (2d Cir.1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 957, 35 L.Ed.2d 276 (1973).

■ The defendants argue that there is substantial risk that the jury may become confused and draw an improper inference that evidence admitted against one defendant supports a finding of guilt against another. However, separate trials are not required when evidence may be admissible against one defendant but not

against others. *United States v. Rucker,* 586 P.2d at 902; *United States v. Petrone,* 499 F.Supp. 29, 33 (S.D.N.Y.1980). Additionally, when the crime involves a scheme, plan or enterprise, joint trials are appropriate. *See United States v. Girard,* 601 F.2d 69, 72 (2d Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).

■ Differences as to nature, degree and quantity of evidence do not preclude a joint trial. *United States v. Aloi,* 511 F.2d 585, 598 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); *see United States v. Lyles,* 593 F.2d 182, 191–92 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). The evidentiary spillover which concerns the defendants will be avoided by this court's instructions to the jury. *United States v. Papadakis,* 510 F.2d 287, 300 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. Moten,* 564 F.2d at 628. This court is not faced with the situation existing in *United States v. Kelly,* 349 F.2d 720, 726, 758–59 (2d Cir. 1965), in which the government introduced co-defendants' post-conspiracy testimony and letter against a third defendant. The court ruled that the introduction of hearsay evidence against the third defendant mandated severance at that time. Defendants' reliance on *Kelly* is misplaced.

■ Moreover, the defendants' allegations of prejudice must be balanced "against the prejudice to the public interest caused by the time, expense, delay, and duplication of trials." [9] *United States v. Aloi,* 449 F.Supp. 698, 746 (E.D.N.Y.1977). The defendants have demonstrated no prejudice beyond that which is inevitably present when a serious charge of criminal activity is made against a number of defendants. Such a showing does not meet the Rule 14 requirements.[10] Therefore, this court concludes that the defendants have

---

**9.** Five defendants have specifically raised this issue. Others have joined in the motion. The time, expense, delay and duplication involved in separate trials outweighs the allegation of prejudice to the defendants.

**10.** Joinder which may otherwise be inappropriate is permissible when all defendants are joined in an enterprise under RICO. *United States v. Welch,* 656 F.2d 1039, 1050 (5th Cir. 1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982).

not met their burden of showing substantial prejudice. The motion to sever is denied.

*Surplusage*

Defendants move pursuant to Rule 7(d), Fed.R.Crim.P. to strike references in paragraphs 1 and 2 of the indictment to "Bonanno Family," "La Cosa Nostra," "Boss," "Crews," "Capodecino," "Sister of the Shah of Iran," as surplusage. The motion is denied as to each word.

■ A motion to strike surplusage is granted only where it is clear that the allegations are not relevant to the crime charged and are inflammatory and prejudicial. *United States v. Claytor,* 52 F.R.D. 360, 361 (S.D.N.Y.1971); *United States v. Pilnick,* 267 F.Supp. 791, 802 (S.D.N.Y. 1967); *United States v. Klein,* 124 F.Supp. 476, 479–80 (S.D.N.Y.1954); *see* Fed.R. Crim.P. 7, Notes of the Advisory Committee. Since the standard for surplusage is exacting, only rarely is alleged surplusage stricken from the grand jury indictment. 1 Wright, Federal Practice and Procedure § 127, at 278 n. 15 (1969); *see United States v. DePalma,* 461 F.Supp. at 797.

■ The determinative question in a motion to strike surplusage is not the potential prejudice, but rather the relevance of the allegation to the crime charged in the indictment. If the evidence of the allegation is admissible and relevant to the charge, then despite prejudice, the language will not be stricken. *United States v. Chas. Pfizer & Co.,* 217 F.Supp. 199, 201 (S.D.N.Y. 1963). In addition, "the government may broadly allege that which it intends to prove and that which under applicable principles of law it may prove." *United States v. DePalma,* 461 F.Supp. at 797; *see United States v. Chovanec,* 467 F.Supp. 41, 46 (S.D. N.Y.1979).

■ Defendants claim that the words they challenge are sufficiently prejudicial to be stricken from the indictment. The government alleges that defendants are a group of individuals associated to commit criminal activities, an "enterprise," as defined by 18 U.S.C. § 1961(4). The references in the indictment to "the Bonanno Family of La Cosa Nostra" serve to identify the "enterprise" and the means by which its members and associates conduct various criminal activities. The government is entitled to prove that "the Bonanno Family of La Cosa Nostra," the enterprise it has described, exists and that the defendants are associated with it. *See generally United States v. Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. To buttress its claim of relevance, the government has stated that four defendants named in the indictment specifically referred to La Cosa Nostra on tape. *Cf. United States v. Miller,* 381 F.2d 529, 536 (2d Cir.1967), *cert. denied,* 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968) (government entitled to use aliases when relevant despite prejudice); *United States v. Ostrer,* 481 F.Supp. 407, 419 (S.D.N.Y. 1979) (same).

Therefore, despite the potential prejudice that may arise from the inclusion in the indictment of "the Bonanno Family of La Cosa Nostra," these words are relevant and will not be stricken from the indictment.

■ Defendants' requests to strike "Boss," "Crews," and "Capodecino" are also denied. These words are explanatory and tend to clarify the structure of the "enterprise" and the role each defendant allegedly held within the association. *United States v. Archer,* 355 F.Supp. 981, 989 (S.D.N.Y. 1972), *rev'd on other grounds,* 486 F.2d 670 (2d Cir.1973). These words are material and relevant.

■ Santora moved during oral argument, to strike the "Sister of the Shah of Iran" from the indictment on the grounds that the defendants are prejudiced by the identification, that the woman's surname without reference to her relation to the Shah of Iran is sufficient. However, the description of the apartment is relevant to establish the intent of the defendants and the scope of the conspiracy. Given the exacting standard for striking surplusage, *United States v. Chas. Pfizer & Co.,* 217 F.Supp. at 201, these words do not meet the requirements as set down by case law and will not be stricken.

*6th Amendment Violations*

 Piteo moves to suppress statements deliberately elicited from him at the request of the government while Piteo was under indictment and represented by counsel in another criminal case, as a violation of his Fifth and Sixth Amendment rights. The motion is denied.

On September 19, 1980, Piteo was indicted in the Southern District of New York. On October 19, 1980, the government filed a superceding indictment charging Piteo with receiving, transporting and disposing of stolen property and conspiracy. Piteo was tried and convicted by a jury on October 13, 1981 and sentenced on March 22, 1982. On November 25, 1981, after conviction and prior to his sentencing, Piteo made incriminating tape recorded statements to Raymond Wean ("Wean"), a non-indicted co-conspirator in the present case, admitting his involvement in some of the alleged criminal acts charged in the indictment currently in issue. Piteo seeks to have these statements suppressed.

In moving to suppress the incriminating statements, Piteo relies on *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1963). In *Massiah,* the defendant was indicted for violation of the federal narcotics laws. He retained a lawyer, pleaded not guilty to the charge and posted bail. While on bail, a federal agent succeeded in obtaining incriminating statements made by the defendant which were then used at trial to assist the government in securing a conviction against the defendant on the federal narcotics charge. The Court in *Massiah* held that the government could not introduce a defendant's incriminating statements which were elicited without the presence of counsel after the defendant was indicted. *Id.* at 206, 84 S.Ct. at 1203. However, the court also stated that "it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant has already been indicted." *Id.* at 207, 84 S.Ct. at 1203.

The fact that Piteo was indicted and convicted on one charge does not extend his Sixth Amendment rights for all time to an as yet uncharged indictment. *Massiah* does not mandate suppression of incriminating statements obtained by the government in the absence of counsel at a trial under a subsequent indictment, even though the defendant was represented by counsel in connection with a previous charge. *Id.* at 202–03, 84 S.Ct. at 1200–01, *see United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

Since Piteo was not under indictment for RICO violations when he made the statements at issue, his Sixth Amendment rights as delineated by *Messiah* had not attached, and the statements made to Wean are admissible into evidence in the present action.

*Double Jeopardy*

 Additionally, Piteo moves pursuant to Rule 12 Fed.R.Crim.P. to dismiss the indictment on the ground that prosecution is barred by the double jeopardy clause of the Fifth Amendment. The motion is denied.

After Piteo was convicted in 1981 and before he was sentenced by the Honorable Kevin T. Duffy in 1982, a *Fatico* hearing was conducted. Wean testified about Piteo's involvement in the theft of a truckload of tuna fish and an attempted robbery of the apartment of the sister of the Shah of Iran—activities which form the basis of two predicate acts in counts 1 and 2 of the present indictment. Piteo contends that Judge Duffy considered the testimony concerning Piteo's involvement in the theft of tuna fish and the attempted robbery when he imposed sentence and that therefore the trial and possible sentence on counts 1 and 2 of the present indictment relating to the same acts place him in double jeopardy.

The Fifth Amendment guarantee against double jeopardy "protects against a second prosecution for the *same* offense after acquittal, ... against a second prosecution for the *same* offense after conviction, ... [and] against multiple punishments for the *same* offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted) (em-

phasis added). Even if evidence of Piteo's commission of theft and attempted robbery influenced Judge Duffy in his decision to impose sentence, the present RICO prosecution of Piteo is not barred by the double jeopardy clause.

In *United States v. Boylan,* 620 F.2d 359, 361 (2d Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980), the Second Circuit held that prosecution and subsequent consecutive sentences for both a RICO offense and the underlying predicate offenses does not violate the double jeopardy clause. "The purpose of RICO was to establish 'new penal prohibitions, and ... enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.'" *Id.* (*quoting* Organized Crime Control Act of 1970, Statement of Findings and Purpose, 84 Stat. 922, *reprinted in* [1970] U.S.Code Cong. & Ad.News, at 1073). In light of this purpose, the Second Circuit concluded that separate convictions and additional sentences were not precluded for a RICO prosecution and an underlying offense. *Id., see United States v. Rone,* 598 F.2d 564, 571 (9th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980).

Thus even assuming that Piteo was sentenced for his involvement in the tuna theft and in the attempted robbery, a conclusion I do not reach, a prosecution alleging a RICO violation having these criminal activities as predicate acts is not barred. Piteo's motion is denied.

*Venue*

 Tomasulo moves for a change of venue to the Eastern District of New York on the grounds that certain acts including a wiretap order and the evidence obtained from the taped conversations, took place outside the Southern District. The motion is denied.

Rule 18 Fed.R.Crim.P. provides that "prosecution shall be had in a district in which the offense was committed." Rule 21 Fed.R.Crim.P. allows for a change of venue for the convenience of the parties and the witnesses and in the interests of justice. The decision to transfer rests in the discretion of the trial judge. *United States v. Keuylian,* 602 F.2d 1033, 1038 (2d Cir.1979).

The government alleges that the criminal enterprise which the indictment charges, operated in this district. Under Rule 18, the Southern District of New York is a proper forum. Tomasulo has failed to demonstrate pursuant to Rule 21 that the Southern District is an inconvenient forum for the defendant and his witnesses and that a fair and impartial trial is unobtainable in this district. *United States v. Gruberg,* 493 F.Supp. 234, 242 (S.D.N.Y.1979). Therefore the motion for a change of venue is denied.

Additionally, Tomasulo moves to dismiss the indictment. For reasons set forth in this court's memorandum opinion dated May 18, 1982, this motion is denied.

*Suppression of Address Book*

Mulligan moves to suppress the physical evidence obtained from a search of the defendant at the time of his arrest. This motion is denied.

A warrant for Mulligan's arrest was issued on March 25, 1982 in the United States District Court for the Southern District of New York. Mulligan was subsequently placed under arrest at the corner of 77th Street and York Avenue, New York, N.Y., and transported to the Queens office of the F.B.I. At the office he was searched and two address books were removed from his clothing and photocopied.

 The Supreme Court has held that once there has been a lawful arrest, a full search of the person detained may be conducted without a warrant, *United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 471, 38 L.Ed.2d 427 (1973), and that the search would be valid despite a time lapse between the place of arrest and the subsequent taking of the property at the place of detention. *United States v. Edwards,* 415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974).

 Since the arrest gives authority to search, a police officer or agent is entitled

to inspect the possessions of the person detained, and if the inspection reveals any information which is of evidentiary significance, he is entitled to seize them as fruits or instrumentalities probative of criminal conduct. *United States v. Robinson,* 414 U.S. at 236, 94 S.Ct. at 477. In *United States v. Frankenberry,* 387 F.2d 337 (2d Cir.1967), the Second Circuit held that the defendant's diary seized from his clothing in a search incident to his arrest was entirely proper, and that the entries from the diary could be read to the jury.

 Mulligan's address book was found in his immediate possession pursuant to a valid search incident to a custodial arrest. Under *Frankenberry,* the motion to suppress the address books obtained from a search of Mulligan at the time of his arrest is denied.

### Suppression of "Consensual" Tape

Mulligan moves to suppress two tape recorded conversations of April 16, 1981, and one videotape recorded conversation of November 24, 1980 on the ground that the recordings violated his expectations of privacy and were taken without the authority of a judicial order. The motion is denied and no hearing will be required.

 It is well established that a judicial order is not required for tape recording a conversation when "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c); *see United States v. White,* 401 U.S. 745, 753, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971). In addition, warrantless recordings of a conversation between a defendant and a government agent or informer who gave consent to the recording, have consistently been admitted into evidence over Fourth Amendment objections.

In *United States v. White,* 401 U.S. at 751–52, 91 S.Ct. at 1126, the Court stated that although a person having a conversation with another regarding criminal activities usually does not expect that person to be a government agent or informer, he has no "justifiable expectation" that the latter

may not have consented to a government agent's listening in or making a recording and therefore has no interest protected by the Fourth Amendment.

 An agent who conceals his identity may write down his conversation with a defendant and testify concerning it without a warrant authorizing his communications with the defendant and without violating the defendant's Fourth Amendment rights. *Hoffa v. United States,* 385 U.S. 293, 300–303, 87 S.Ct. 408, 412–14, 17 L.Ed.2d 374 (1966). No different result is reached if the agent simultaneously records the conversation with electronic equipment he is wearing on his person or transmits it to a place where it is recorded by government agents. *Lopez v. United States,* 373 U.S. 427, 439, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462 (1963).

 Mulligan has raised no allegations which amount to an invasion of his constitutionally protected rights. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Taborda,* 635 F.2d 131 (2d Cir.1980). In the instant case, all of the recordings which defendant Mulligan seeks to suppress were made with the consent of a party to conversations. These recordings were not obtained by means of an unlawful physical invasion of the defendant's premises under circumstances which would violate the Fourth Amendment. No facts have been alleged which could give rise to a claim that the videotape constituted an improper invasion of defendants' rights. Consequently, the motion to suppress the tape recorded conversations and videotaped conversation is denied and no hearing on these issues is required.

### Pre-Conspiracy Crimes

 Mulligan has moved to preclude the government from introducing at trial evidence of a 1969 truck theft to prove an association between Mulligan and Cerasani and any other criminal acts committed by Mulligan prior to inception of the conspiracy, as charged in the indictment.

The issue presented before the court is whether prior crimes are admissible to show an association between Mulligan and other defendants. Admissibility of prior crimes evidence will depend upon whether the prior crimes are relevant to some issue at trial, Fed.R.Evid. 404(b), and whether the probative value of such evidence outweighs its prejudicial value. Fed.R.Evid. 403. *United States v. Mohel*, 604 F.2d 748 (2d Cir.1979); *United States v. Papadakis*, 510 F.2d 287, 294 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). Probative value is dependent on the existence of a "close parallel" between the crime charged and the acts shown. *United States v. Chestnut*, 533 F.2d 40 (2d Cir.), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976), including the remoteness of a conviction. *United States v. Corey*, 566 F.2d 429 (2d Cir.1979).

In *United States v. Figueroa*, 618 F.2d 934, 939 (2d Cir.1980), the Second Circuit has stated that the

> procedure for determining admissibility depends on the grounds on which the government offers the evidence. If the evidence is offered to prove that the defendant committed the act charged in the indictment, for example, by proving identity or common scheme, the evidence may be offered during the prosecution's case-in-chief, unless the defendant's commission of the act is not a disputed issue. On the other hand, if the evidence is offered to prove the defendant's knowledge or intent, the offer of similar acts evidence should await the conclusion of the defendant's case and should be aimed at a specifically identified issue.

Therefore this court will reserve decision on this issue until trial.

*Sequestration*

The government has moved for an order, pursuant to Rule 7(c) of the Local Criminal Rules, sequestering the jury for the duration of the trial. The motion is denied.

The government's request is based upon the likelihood of substantial prejudicial publicity and the possibility of prejudicial juror contact. Defendants oppose sequestration as onerous and prejudicial in that it would exclude significant numbers of those eligible for jury selection.

The decision concerning whether a jury should be sequestered is "entrusted to the sound discretion of the trial judge." *United States v. Johnson*, 584 F.2d 148, 154 (6th Cir.1978), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1240, 59 L.Ed.2d 469 (1979); *see Holt v. United States*, 218 U.S. 245, 250–51, 31 S.Ct. 2, 5, 54 L.Ed. 1021 (1910). Courts have recognized that "sequestration is one of the most burdensome tools of the many available to assure a fair trial. It necessarily narrows the cross section from which a jury is drawn by eliminating those persons for whom a lockup would be prohibitive." *Mastrian v. McManus*, 554 F.2d 813, 819 (8th Cir.), *cert. denied*, 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977); *see United States v. Porcaro*, 648 F.2d 753, 755 (1st Cir.1981); *United States v. Boffa*, 513 F.Supp. 444, 493 (D.Del.1980). The government as well as defendants, however, "has a substantial interest in having guilt or innocence decided by a jury free from prejudicial influences," *United States v. Haldeman*, 559 F.2d 31, 85 n. 135 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), and courts have granted sequestration motions despite defense objections. *Id.; Baker v. United States*, 401 F.2d 958, 967–68 (D.C.Cir.1968); *United States v. Holovachka*, 314 F.2d 345, 351–52 (7th Cir.), *cert. denied*, 374 U.S. 809, 83 S.Ct. 1695, 10 L.Ed.2d 1033 (1963), *but see Reinstein v. Superior Court*, 661 F.2d 255, 256 (1st Cir.1981), *cert. denied*, 455 U.S. 995, 102 S.Ct. 1625, 71 L.Ed.2d 857 (1982); *In re NBC, Inc.*, 635 F.2d 945, 948 (2d Cir.1980). In *United States v. Myers*, the trial court denied sequestration because of defendant's objection despite the national publicity involved in ABSCAM. *See* 635 F.2d 932 (2d Cir.1980).

The purpose of sequestration is "to protect the jury from interference." *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). The government anticipates substantial publici-

ty during the course of a six-week trial and points to the extensive pretrial coverage given to the murders that form the predicate acts of the crimes charged in the indictment. Additionally, the arrests and arraignments of defendants as well as the return of the indictments were fully reported.

 When a trial is likely to arouse substantial media coverage and public interest, "the trial judge should be alert to safeguarding the jury from any potential interference with its decision." *United States v. Robinson,* 503 F.2d 208, 215 (7th Cir.1974), *cert. denied,* 420 U.S. 949, 95 S.Ct. 1333, 43 L.Ed.2d 427 (1975). However, sequestration is but one method to accomplish this goal. The Second Circuit has suggested an alternate procedure in *United States v. Palmieri,* 456 F.2d 9 (2d Cir.), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2054, 32 L.Ed.2d 332 (1972).

> Where juries are not generally sequestered (e.g., Connecticut; the Southern District of New York) and the trial judge can anticipate prejudicial publicity, he might inform the jury of its duty not to read or listen to any story about the trial, tell the jurors on their oath that he will ask them on their oaths the following morning if they have read or listened to any such stories, and then do just that before starting the next day's trial. This can help eliminate the possibility of prejudice.

*Id.* at 14 n. 3.

Additionally, in *United States v. Persico,* 425 F.2d 1375, 1378–81 (2d Cir.), *cert. denied,* 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970), the Second Circuit approved of the procedure employed by the Hon. John F. Dooling to determine whether banner headlines and extensive radio and television coverage concerning the government's decision to call Joseph Valachi (a reputed Mafia figure and member of La Cosa Nostra) as a witness against defendants, would impede the jurors from giving defendants a fair trial. Judge Dooling determined that even though members of the unsequestered jury read and heard these news reports, the publicity did not prevent a fair trial. The Court of Appeals affirmed. *Id.* at 1382.

 Given the anticipated length of the trial (six weeks) during the summer months [11] and the burdens on jurors and their families during sequestration as well as the difficulty inherent in obtaining a fair cross-section of the community, I conclude that the expected publicity does not warrant sequestration.[12]

Curative instructions will be given to the jury to refrain from reading about, listening to, or viewing any material about the trial and from discussing the case with anyone. Additionally the procedure announced in *United States v. Palmieri,* 456 F.2d at 14 n. 3, will be followed.

 However, the government raises another issue which must be considered. The government alleges that during a previous trial[13] of Cerasani and Mulligan, a juror was approached on behalf of Mulligan and with Cerasani's knowledge by Mulligan's former partner on the New York City Police Department who told the juror that Mulligan "is a very dear friend. I know he didn't do it." This allegation is based on a videotaped conversation, authorized in the investigation leading to the present indictment, which the government contends occurred on November 24, 1980 in Tampa, Florida. (Reel # 78)

At oral argument, defendants contended that the discussion with the juror referred

---

**11.** Because Ruggiero has been in prison since his arrest on the present charges in August 1981, it has been the goal of this court to try this case as swiftly as possible without sacrificing the interests of justice. A postponement to the Fall to suit the summer plans of the prospective jury panel, counsel and court is not warranted.

**12.** This case does not present the situation which existed in *United States v. Barnes,* 604 F.2d 121 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), concerning a history of violence requiring all possible safety measures to protect the jury. *Id.* at 134–35 & n. 3.

**13.** The trial resulted in a hung jury.

to on the tape occurred after the trial was completed and that the second trial resulted in a conviction. The partial transcript submitted by the government does not indicate the time and effect of the conversation with the juror and does not constitute sufficient evidence on which to conclude that sequestration is required in the present case to prevent jury tampering.

*Disclosure of Special Agents Identities*

The government moves to withhold the true identities of two undercover Special Agents of the Federal Bureau of Investigation ("FBI") and to permit them to testify at trial using the names by which they were known to the defendants during their undercover activities. The motion is denied.

The government has urged that the revelation of their true identities would place the agents and their families in jeopardy, based on the events which are the subject of the indictment and certain informant and undercover information.

The Supreme Court has repeatedly held that the rights of confrontation and cross-examination are fundamental requirements for the protection of defendants in criminal cases. *Kirby v. United States,* 174 U.S. 47, 55, 56, 19 S.Ct. 574, 577, 43 L.Ed. 890 (1899) and essential "for the kind of fair trial which is this country's constitutional goal." *Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931); *see Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

■ Cross-examination is the principal way to test the believability and truth of a witnesses' testimony. *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). Subject to the trial judge's broad discretion to prevent repetitive and harassing questions, the cross-examiner is not only permitted to delve into the witness' story in order to test the witness' memory and perception, but also has traditionally been allowed to impeach and discredit the witness. This may be done by introducing evidence of prior crimes or by revealing "possible biases, prejudices or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

In *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1969), the defendant was denied the right on cross-examination to elicit the true name and address [14] of a crucial prosecution witness testifying under a false name. The Supreme Court overturned the conviction of the defendant and held:

> [W]hen the credibility of a witness is in issue, the very starting point in exposing falsehood and bringing out the truth through cross examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.

■ Although the witness in *Smith* was not a government agent, this case as well as the cases concerning the identities of informants who testify at trial, provide guidance for the issue at bar. There is no fixed rule with respect to disclosure of an informant's true identity. The issue is one that requires a balancing of the public interest in effective law enforcement against the individual's right to prepare his defense. The particular circumstances of each case are considered and the crime charged, the possible defenses, the possible significance of the informer's testimony and other relevant factors are all taken into consideration. *Roviaro v. United States,* 353 U.S. 53, 62, 77 S.Ct. 623, 628–29, 1 L.Ed.2d 639 (1957).

■ The Supreme Court has held it reversible error to refuse to disclose the identity of an undercover employee who "helped to set up the commission of the crime and

---

14. The defendants will not be permitted to elicit the address of the special agents. The inability to acquire an address will not prejudice or prevent the defendants from conducting an investigation of the agents. *United States v. Cavallaro,* 553 F.2d 300, 304 (2d Cir.1977).

was present at its occurrence." *Id.* at 61, 77 S.Ct. at 628. Furthermore, it is settled in the Second Circuit that the identity of an informant must be made known where his story constitutes the essence or core of the evidence brought forth against the defendants. *United States v. Tucker,* 380 F.2d 206, 212 (2d Cir.1967); *see Mapp v. Warden,* 531 F.2d 1167 (2d Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976).

█ In the instant case, two Special Agents of the FBI infiltrated the alleged criminal organization and participated in the investigation for over four years. It is alleged they participated with the defendants in the course of several of the alleged crimes and witnessed criminal acts of the defendants. Their identity as undercover agents and their testimony are highly material. *Roviaro v. United States,* 353 U.S. at 63, 77 S.Ct. at 629.

The government's motion is based on the privilege to withhold from disclosure the identity of people who provide information of violations of law. The purpose of the privilege of non-disclosure recognizes the "obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.* at 59, 77 S.Ct. at 627. Here, the Special Agents were employed to infiltrate and investigate the alleged criminal organization and thereby accepted the risks inherent in that position. There is no question but that these agents played a critical role in bringing about the prosecution of the defendants and that their testimony will be of central importance at trial.

If the agents are permitted to testify under false names, prejudice to the defendants would result from the necessary limitation concerning the scope of the cross-examination as to the agent's identity, history and credibility, as well as concerning any investigation of the agents in or out of court. This investigation may produce information which would be important to the jurors, as sole triers of facts and of credibility, to appropriately draw inferences relating to the reliability of the witnesses. *Davis v. Alaska,* 415 U.S. at 316, 94 S.Ct. at 1110. Such a limitation would violate the defendants' constitutional rights. *United States v. Marti,* 421 F.2d 1263, 1265 (2d Cir.1970).

To allow the agents to use assumed names without divulging this to the jury would permit the jury to assume that the agents' identity and background are unimpeachable. On the other hand, to disclose that the agents are concealing their names might permit the jury to assume, despite any instructions by the court to the contrary, that any threat to the agents' safety stem from these defendants. *See United States v. Watson,* 599 F.2d 1149, 1158 (2d Cir.1979). This would violate the defendants' right to a fair trial by an impartial jury and adversely affect the defendants' presumption of innocence.

The defendants seek to evoke the image of a masked witness and procedures of the Star Chamber while denying any risk to agents and proclaiming the efficacy of the witness protection program. The temptation to review that program must be resisted [15] and there can be no question but that these agents were, are and will be at risk. Certainly their performance as set forth by the government establishes their courage, heroism and skill as front line fighters in the war against crime and entitles them to every appropriate protection. This includes the withholding of the location of their homes, family situation, and any additional information which is of tangential relevance and might increase their exposure to risk. The balance between the personal security of the agents and the constitutional rights of the defendant tips in favor of the defendants on the issue of identity and in favor of the witnesses with respect to address and family circumstances. A similar analysis will be used on any additional requests by the government. However, to grant the government's request would deny the courage of the agents and the principles of an open society and the rule of law.

15. Bishop, 'The Program' that protects crimi- nals, 2 California Lawyer 28 (March 1982).

The motion to preclude revelation of the agents' identity is denied.

All counsel are directed to appear at a pretrial conference on Wednesday, July 7, 1982 at 4:30 p.m. in courtroom 506. Trial will commence on Friday, July 16, 1982 at 9:30 a.m. in courtroom 506.

IT IS SO ORDERED.

## ON MOTIONS TO DISMISS AND TO REDUCE BAIL

■ Defendant Benjamin Ruggiero ("Ruggiero") moves pursuant to 18 U.S.C. §§ 3161(b), 3162(a)(1) for an order dismissing the indictment against him on the grounds that Ruggiero was not indicted within thirty days of his arrest. The motion is denied. Additionally, Ruggiero's May 3, 1982 application to reduce bail is denied.

The procedural history relevant to this motion starts with the arrest of Ruggiero on August 29, 1981. On September 9, 1981, pursuant to 18 U.S.C. § 3161(h)(8), the government applied for and received a thirty day continuance of the date for a preliminary hearing or indictment. The government cited the complex nature of the case, the need to protect an ongoing undercover investigation, and the extensive evidence, including electronic surveillance, which required analysis prior to indictment. On October 8, 1981, the government applied for and received an additional forty-five day delay on essentially the same basis as the initial motion and in addition, on the need to procure grants of immunity from Washington for several grand jury witnesses and to coordinate with investigations in the Southern District of Florida. Ruggiero was indicted on November 23, 1981.

Ruggiero concedes that the factors relied on by the government may in certain circumstances warrant extensions of time within which to indict. However, he contends that the existence of appropriate reasons for delay cannot form the basis for a continuance when the government causes an arrest to be made for tactical purposes, knowing that the indictment is not contemplated within the statutory period. According to Ruggiero, on the date of his arrest, August 29, 1981, the government knew that it would be impossible to return an indictment within the required thirty days from the date of arrest. Additionally he contends that the decision to arrest was a stratagem designed to create dissention among the potential defendants and to persuade Ruggiero to cooperate with the FBI. Consequently, because of this, Ruggiero asserts that the reasons given by the government concerning an extension of time within which to indict were not a proper basis for a continuance.

The government concedes that it arrested Ruggiero knowing that it would be impossible to indict Ruggiero within thirty days. It also concedes that "[b]efore his arrest, at the time of his arrest, and subsequent to his arrest, Ruggiero was asked if he was willing to cooperate with the government." However, the government denies that the arrest was a tactical maneuver to obtain Ruggiero's cooperation.

According to the government, the decision to arrest Ruggiero was made in order to guarantee his appearance at trial, there being cause to believe that Ruggiero might disappear. Ruggiero had been told that an FBI agent, Donnie Brasco, had infiltrated his activities. Dominick Napolitano ("Napolitano"), an alleged associate of Ruggiero, when given the same information [1] disappeared. Intercepted conversations indicated that Napolitano may have been killed by associates in his own crime family, and the FBI received information from a confidential informant Raymond Wean ("Wean") that Ruggiero was about to be murdered and that taped conversations lent support to Wean's information.

Ruggiero challenges the government's claim that the arrest was necessitated by its belief that a threat to his life existed which

---

1. The FBI told Napolitano that Brasco was an agent to warn them not to harm Brasco and to seek his cooperation.

would cause him to flee. Specifically, he questions the government's reliance on Wean's information, and the corroboration by Cerasani's alleged participation in the murder of Alphonse Indelicato. Ruggiero points to Wean's criminal record and the fact that Cerasani has not been named in the indictment for having participated in any murders. Additionally Ruggiero contends that in the course of the many bail applications, the government had repeatedly claimed that threats against Ruggiero's life had been recorded on tape. Ruggiero points to the disparity between the government's alleged claim and the fact that no tape has been submitted containing a death threat against him.

The government has presented evidence of Wean's reliability as a confidential informant and his report of the murder threat. Moreover, the failure to indict Cerasani does not negate the government's assertion that he participated in the murder of Alphonse Indelicato but rather that the government had insufficient proof to indict him. Additionally, the government asserts that it has never claimed that any threat information was recorded on tape. Finally, Napolitano's disappearance and the similarity between Brasco's relationship with Napolitano and Ruggiero [2] further support the likelihood that Ruggiero might flee. Moreover, no reported cases have been cited for the proposition that an otherwise valid extension of the time for indictment becomes invalid because the government in its timing of the defendant's arrest sought to maximize the possibility of his cooperation. The motion to dismiss the indictment must turn on the validity of the extensions of the thirty day period as to which no serious attack has been made. The motion must therefore be denied.

Moreover, Ruggiero relies on the same facts in his application to reduce bail. The evidence which supports the government's allegation of a death threat and the concomitant likelihood of flight have been the subject of the prior applications to reduce bail brought by Ruggiero. Nothing has

been presented at this time to change my prior rulings on that subject. Indeed, recent death threats soon to be the subject of another opinion merely serve to fortify my previous views.

Ruggiero's motion to dismiss the indictment is denied as is his application to reduce bail.

IT IS SO ORDERED.

### ON MOTION TO PROHIBIT TRIAL IN ABSENTIA

Defendant Anthony Rabito ("Rabito") moves to prohibit the government from trying Dominick Napolitano ("Napolitano") and Joseph Messina ("Messina") in absentia. Aside from considerations of standing which preclude Rabito from raising this motion, the fact is that Napolitano and Messina are not being tried in absentia. All cases cited by Rabito involved situations in which the absent defendants were actually tried in absentia, consequently they are inapplicable. The jury will be instructed to draw no inference from the fact that some defendants who are charged in the indictment are not being tried.

IT IS SO ORDERED.

---

**2.** Ruggiero and Napolitano are asserted to be responsible for Brasco's introduction to and

participation in the activities of the defendants and their associates.