UNITED STATES of America, Plaintiff,

v.

Luis JIMENEZ, a/k/a "Bello," a/k/a "Juan Diego," Carlos Enrique Perdomo, a/k/a "Rigo," Jose Urena, a/k/a "Jose Jimenez," Jose Miguel Rodriguez, a/k/a "Caballo," Roman Santiago, a/k/a "Frank Roman," Yvonne Burgos, Ines Urena, Gregoria Morel Bejaran, a/k/a "Bernadina," Jose Ramon Montoya, a/k/a "Monte," Rafael Colon, a/k/a "Andrew," Jimmy Rosado, a/k/a "Junior," Hector Ventura, a/k/a "Rubio," Pedro Guzman, Francisco Lnu, a/k/a "Pinguino," Daniel Urena, Usmare St. Hilare, a/k/a "Luisito," Raymond Comas, Moises Cuevas, Aparicia Urena Soto, a/k/a "Nana," Gloria Santos, Idelisse Reyes, a/k/a "Tammy," Agapito Velez, a/k/a "Pete," and Norberto Gomez, Defendants.

No. S1 92 CR. 550(KC).

United States District Court,
S.D. New York.

May 5, 1993.

Kenneth Paul, New York City, for Jimenez.

Andrew G. Patel, New York City, for Perdomo.

Michael Sporn, New York City, for Ines Urena.

Clover M. Barret, Brooklyn, NY, for Montoya.

George R. Mayer, Bronxville, NY, for Velez.

Robert Herbst, New York City, for St. Hilare.

Marion Seltzer, New York City, for Comas.

Daniel Felber, Balsam & Felber, New York City, for Guzman.

Roger J. Schwarz, New York City, for Ventura.

Anthony L. Ricco, Ricco & Villanueva, New York City, for Urena Soto.

Leonard J. Levenson, New York City, for Cuevas.

Edward D. Wilford, Wilford & Ramsey, New York City, for Rosado.

Lawrence Schoenbach, New York City, for Colon.

Lawrence Vogelman, New York City, for Daniel Urena.

## ORDER

CONBOY, District Judge:

The defendants in this case are charged with conspiracy to distribute crack cocaine, engaging in a continuing criminal enterprise, possessing with intent to distribute crack cocaine, providing a premises for storage of cocaine, using firearms during and in relation to drug trafficking crimes and the possession of a machine gun, in violation of various sections of Titles 18 and 21, United States Code.

The indictment before the Court names twenty-three defendants, four of whom are fugitives and several of whom have pleaded guilty. Defendants Perdomo, Montoya, Cuevas, Soto and St. Hilare have filed pretrial motions and Jimenez, Ines, Urena, Colon, Daniel Urena, Rosado, Comas, Guzman and Velez have advised the Court that they join in the motions of co-defendants.

Defendant Hector Ventura is in the process of filing a motion not presently fully submitted, and it will be addressed when resolved in a separate order.

Montoya has moved for a bill of particulars, a severance, and the suppression of wiretap evidence. He is charged only in the conspiracy count, and is named in only one of

23 overt acts. He seeks to compel the Government to specify the dates on which and the selling location at which and the manner in which, he is alleged to have functioned as the shift manager, and the violent acts, if any, the Government asserts he committed or assisted. Without such information, Montoya argues that he cannot develop a defense. His request for a severance is based upon a fear of spillover prejudice resulting from such a large number of defendants, of such varying putative culpability. Montoya also argues that the wiretap evidence should be suppressed in the absence of proper minimization and in view of available alternative investigative means.

When Perdomo's home was searched pursuant to a search warrant issued by a Magistrate Judge, narcotics and related paraphernalia were seized, in addition to a handgun found under a mattress in one bedroom, and a number of weapons found in a locked safe in the basement.

Perdomo argues that the search warrant was defective because the agent's application contained a knowingly false or reckless statement, to the effect that surveillance had established that bags of crack and bags of money were carried into and out of Perdomo's house. He insists that the pertinent government surveillance reports do not support this claim, and he argues that under prevailing case authority he is entitled to a hearing on the matter.

He has moved to suppress the wiretap evidence and the fruits of the search of his home; for an *in limine* ruling that weapons seized therein are inadmissible under Rule 403; for a complete severance or at least a partial severance on Count Thirteen; for a bill of particulars disclosing dates, locations, manner and means with respect to his asserted use or carriage of a firearm in relation to the charged crimes; for a striking from the indictment of the "Means and Methods" section of the Indictment on the grounds that it is irrelevant, prejudicial and a mini-summation by the Government.

Perdomo moves to suppress wiretap evidence on the grounds that the application for the electronic surveillance failed to contain a full and complete statement regarding the pursuit or adequacy of alternative investigative procedures, in that the Government asserted that alternative investigative techniques had failed to locate the factory where cocaine was processed into crack and packaged into vials, that Perdomo's home is asserted by the indictment to be the factory, and that agents were aware of and had surveilled the premises prior to the application for the eavesdrop warrant.

On his Rule 403 claim, Perdomo argues that there will be no facts from which a jury could infer that the weapons found in his home were readily available to protect a drug operation, and he demands a pretrial hearing on the matter. He further asks for a severance on the possession of a machine gun count if the Government cannot show that it was used during or in relation to the drug trafficking charges. He also asks for a full severance on the ground that he played a lesser role in the conspiracy and will suffer prejudicial spillover if he is tried with the other defendants.

Cuevas moves for a severance, a striking of the "Means and Methods" section of the indictment, advance notice of 404(b) evidence that the Government intends to introduce, and a bill of particulars that seeks the identification and reports of expert witnesses, the names of witnesses not to be called by the Government, the notes, statements and reports of all Government witnesses, agreements and payments between the Government and its cooperating witnesses, the results of any polygraph examinations and the criminal records of any Government witnesses, the names of co-conspirators and the manner in which Cuevas committed the crimes alleged.

Soto moves to suppress wiretap evidence on the ground that the application failed to allege adequately that other investigative procedures had been tried and failed or were unlikely to succeed if tried or were too dangerous. He in substance argues that twelve months of surveillance and the use of four confidential informants had provided the Government with detailed information about the Louis Bello narcotics organization, and that the seven objectives of the wiretap as

set forth in the application had in fact been already largely achieved.

St. Hilare moves for a bill of particulars, severance, disclosure of the identity of the four confidential informants and an opportunity to interview them, disclosure of any expert witnesses and their reports, disclosure of other crimes evidence, and suppression of evidence taken from his person at the time of his arrest, on the ground that the arrest was without probable cause.

## THE ADEQUACY OF THE INVESTIGATIVE TECHNIQUES AVERMENTS OF THE GOVERNMENT'S WIRETAP APPLICATION

In paragraphs 12 through 44 of his affidavit, ("Mabray Affidavit") Special Agent Keith Mabray provided an overview of the Drug Enforcement Administration's investigation of the alleged criminal enterprise ("Bello organization") that is the subject of the indictment, and a summary chronology of particular investigative steps that had been taken. In brief, the Mabray Affidavit explained that information concerning the alleged organization, its members and leadership had been compiled from several sources, over a period of more than one year, which sources included: 1) three confidential informants ("CI–1," "CI–2" and "CI–4") who admitted to having worked in the Bello organization, and were convicted narcotics offenders, and one confidential informant ("CI–3") who assisted twice in the purchase of crack from Bello organization members (Mabray Affidavit, ¶¶ 14–19); 2) New York City Police Department ("NYPD") and Bureau of Alcohol, Tobacco and Firearms ("ATF") personnel who had executed several search warrants at apartments within 3428 and 3430 Park Avenue in the Bronx and 993–5 Intervale Avenue in the Bronx, which apartments, according to CI–1, CI–2 and CI–4, were being used by the Bello organization to store crack, resulting in the seizure of quantities of crack and several firearms, but which produced no arrests (Id., ¶¶ 21, 32, 43); 3) several consensually monitored telephone calls between CI–4 and the defendants Jose Urena, Norberto Gomez, and Tammy Reyes, and subsequent monitored purchases of crack by CI–4 from Urena, Gomez, Comas and Velez (Id., ¶¶ 22–25);

4) DEA surveillance of exchanges of suspected crack and money by certain members of the organization (Id., ¶¶ 28, 30, 31, 34, 39, 40, 43a); 5) pen register information detailing telephone calls from the Intervale Avenue telephone to several telephones and paging devices linked to the Bello organization and its members (Id. at ¶ 44); and 6) utility and telephone records checks. Through these sources of information and investigative techniques, the DEA identified buildings of likely significance to the organization, including 3315 Cruger Avenue; 3046 Gunther Avenue; 3430 Park Avenue; 3428 Park Avenue; 2105 Muliner Avenue; and 975 Intervale Avenue.

As set out in the Mabray Affidavit, according to information provided by the informants, the Bello organization involved numerous participants, only some of whom the DEA was able to physically observe, let alone surveil. See generally Mabray Affidavit. Some of these alleged participants worked within the sales spots of the organizations (Id., ¶¶ 18, 19), and one allegedly worked in the organization's "crack" factory (Id., ¶ 30). CI–4 knew only the first names of some of the members of the organization.

As the above-cited paragraphs of the Mabray Affidavit explained, CI–4 had an ongoing relationship with two of the organization members during the period of the investigation, but CI–4 was not, during the pendency of the more than 12–month investigation, invited into three locations tied to the Bello organization—3315 Cruger, 2105 Muliner and 3046 Gunther Avenue. Moreover, CI–4 knew of certain members of the organization on a second-hand basis only.

In addition, during the course of the investigation, neither the DEA nor CI–4 was able to identify the source of the Bello organization's raw cocaine, or the "factory" of the organization that CI–4 had been told about. None of the informants knew, moreover, whether Jimenez himself reported to superiors.

The Mabray Affidavit also explained that members of the Bello organization appeared to be surveillance conscious (see Mabray Affidavit, ¶¶ 24, 31, 39). In addition, weapons or ammunition had been recovered in each of

the NYPD searches at the Park Avenue stash apartments (*Id.*, ¶¶ 21, 32, 43).

On the basis of the information obtained through the investigation, Agent Mabray advised former Chief Judge Brieant:

(1) that physical surveillance of suspected Bello organization members had not resulted in the actual identification of numerous suspected members of the organization, and, inevitably, could not establish crucial details of the operations of the organization, such as the roles of all of the individuals associated with the organization, and the locations of physical evidence, such as drugs, weapons, and money (*Id.*, ¶ 45(a));

(2) that the identities of the organization's sources of cocaine were not known (*Id.*);

(3) that intensive physical surveillance on public streets and in public locales of the kind used by the Bello organization was difficult, particularly in light of the surveillance consciousness that certain subjects of the investigation had demonstrated, and because such surveillance would be likely to alert the subjects that their activities were being monitored and would prompt them to modify or further disguise their methods of operation in order to avoid detection (*Id.*, ¶ 45(b));

(4) that, although the confidential informants had provided much valuable information in connection with the investigation, they were not in a position to know or discover the complete scope and methods of the narcotics operations because the organization appeared to be quite large; the informants were privy to certain illegal conduct but not to all critical aspects of the organization's operations such as its "factory" or sources of cocaine; and it seemed unlikely that the informants would ever acquire this information or the identities of all of the persons who were working for the organization (*Id.*, ¶ 45(d));

(5) that infiltration of the organization by an undercover officer was not realistic because the top management of the Bello organization appeared to be tightly knit and wary of outsiders (*Id.*);

(6) that applications for search warrants for all of the locations tied to the Bello organization would be premature since the full scope of the conspiracy had not yet been fully discovered and searches would inevitably alert the targets of the investigation, and, in any event, it was not even known where all of the targets of the investigation were receiving, hiding and distributing the money collected or narcotics sold (*Id.*, ¶ 45(e));

·(7) that use of a federal grand jury did not appear to be a promising method of investigation because (i) the witnesses who could provide additional evidence to the grand jury as to the activities, the sources of supply, and the identities of conspiracy members were members of the conspiracy themselves; (ii) most of these individuals had not been identified and, in any event, faced prosecution and would not likely testify voluntarily; (iii) it was not appropriate to seek immunity for any of the known conspirators to compel their testimony because public policy supported their prosecution; (iv) the known conspirators would not know (or would not truthfully tell the Government) the manner in which higher-level confederates were running their narcotics business or the identities of their suppliers or other high-level confederates; (v) it appeared likely that the subjects would commit contempt rather than testify in view of their solid ties to the narcotics organization described herein; and (vi) the issuance of grand jury subpoenas to other individuals not involved directly in the conspiracy likely would not lead to the discovery of critical information and undoubtedly would alert conspiracy members to the pendency of an investigation (*Id.*, ¶ 45(c));

(8) that telephone toll records and pen register devices, though useful to show probable usage of telephones in drug-related calls, could only show that a conversation had occurred and not what was discussed and by whom (*Id.*, ¶ 45(b)); and

(9) that the use of electronic surveillance could, among other things, reveal the location of the "factory" used by the organization to process and package crack and/or identify the sources of the organization's supplies of raw cocaine and crack; that electronic surveillance would enhance any physical surveillance, not only by identifying individuals, but also in clarifying the nature of activities and

meetings, the locations of those meetings, and tools of the subjects' narcotics trade; and that direct, admissible evidence against the numerous coconspirators with whom the informants did not have any relationship could be collected only through electronic surveillance (*Id.*, ¶ 45(a), (d)).

The defendants challenge the Government's wiretap application chiefly on the ground that the Government's investigation had achieved a high degree of success before the wiretap was initiated. Accordingly, defendants argue, there was no need for a wiretap.

■ This objection misunderstands the nature of the "alternative investigation techniques" requirement. The Government is not required to hit a blind alley before applying for a wiretap. The Government is only required to provide a thorough explanation of investigative steps taken and a reasonable explanation as to why a continuation of similar efforts does not appear likely to achieve legitimate investigative objectives.

■ The approach and content of the Mabray Affidavit was entirely consistent with similar efforts found broadly acceptable by the Second Circuit. For example, in *United States v. Torres*, 901 F.2d 205 (2d Cir.1990), the Court wrote:

"The affidavit submitted by the Government in support of its wiretap application herein described the investigation of the Torres Organization over a fourteen-month period, explaining in detail the traditional investigative techniques employed, including the use of two confidential informants, physical surveillance, record checks and pen registers. The affidavit asserted that these methods only provided a limited picture of the Organization, given the minor role that the two informants played therein and the overall scale of the operation. Moreover, the affidavit provided sound reasons for declining the use of a grand jury or search warrants at the juncture of the investigation." 901 F.2d at 232.

Similarly, in *United States v. Wilkinson*, 754 F.2d 1427 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985),

the Court explained the adequacy of the wiretap application reviewed in that case:

Nor do we find any merit in Mac's contention that the wiretap orders issued by Judge Edelstein and Judge Carter were defective for failure to show, as required by 18 U.S.C. § 2518(1)(c), that other investigative techniques had been tried and failed or would be unlikely to succeed or be too dangerous. We find no reason to disturb Judge Weinfeld's opinion on the subject, [*U.S. v. Shipp*] 578 F.Supp. 980 (S.D.N.Y.1984), which is entitled to deference, *United States v. Martino*, 664 F.2d 860, 867 (2d Cir.1981), *cert. denied*, 458 U.S. 1110 [102 S.Ct. 3493, 73 L.Ed.2d 1373] (1982). After thoroughly investigating the feasibility of alternatives, he found that (1) surveillance had been, and would likely continue to be, ineffective; (2) infiltration was unlikely to be successful because of the secretive nature of the enterprise; (3) concerns about the safety of the agents had arisen; (4) reliance on a search warrant would be premature; and (5) to subpoena Ella Shipp would be worthless, since she was unlikely to testify against her coconspirators even if she were granted immunity. His reasoned explanation, grounded in the facts of the case, "square[s] with common sense." *United States v. Lilla*, 699 F.2d 99, 105 (2d Cir. 1983). This was "no small time narcotics case" of the type faced in *Lilla*, where simple investigative techniques might have sufficed, but a far-flung conspiracy that was impenetrable except by sophisticated electronic means.

*See also United States v. Schwartz*, 535 F.2d 160, 163 (2d Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 581 (1977); *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Esposito*, 423 F.Supp. 908, 912 (S.D.N.Y.1976), *aff'd from the bench*, Docket 77–1147 (2d Cir.1977).

Agent Mabray fully advised former Chief Judge Brieant of the efforts the DEA had made to penetrate the Bello organization, and set forth reasoned explanations of why continued efforts along the same lines would

ultimately yield only a limited investigative picture of the Bello organization. What the Government had established at that point was the outline of a highly complex and dangerous criminal enterprise which conventional investigative techniques could not penetrate and decisively expose in sufficient degree to prosecute all those dominating the organization. Based on the application, former Chief Judge Brieant was amply justified in concluding that alternative investigative techniques had been tried, and that a wiretap would substantially advance the investigation beyond limited parameters and expose additional participants and methods of the conspiracy. These findings merit the substantial deference to which they are entitled.

The defendant Soto also argues that the Mabray Affidavit was misleading. For the reasons set forth in the Government's Memorandum of Law In Opposition to Defendants' Pretrial Motions, dated January 25, 1992, 25–30, we find this assertion to be entirely meritless.

### THE SEIZURE OF EVIDENCE AT 3046 GUNTHER AVENUE

■ As noted, defendant Perdomo contends that the affidavit of Special Agent Mabray, sworn to on June 17, 1992 and filed in support of the search warrant authorized by the Magistrate Judge contained a statement that was either knowingly false or made with reckless disregard for the truth, and demands a *Franks* hearing on the issue.

To challenge successfully the sworn statements in a warrant affidavit, a defendant must make substantial preliminary showings on each of three grounds:

(1) that the warrant affidavit includes a false statement;

(2) that the allegedly false statement was made knowingly and intentionally or with reckless disregard for the truth; and

(3) that the allegedly false statement is necessary to a finding of probable cause.

*United States v. U.S. Currency, The Amount of $228,536.00,* 895 F.2d 908, 919 (2d Cir.), *cert. denied,* 495 U.S. 958, 110 S.Ct. 2564, 109 L.Ed.2d 747 (1990); *see also United States v. Levasseur,* 816 F.2d 37, 43 (2d Cir.1987); *United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985).

Perdomo's motion specifies only one allegedly false statement in the warrant affidavit—paragraph 13(c) of Special Agent Mabray's affidavit. Accordingly, unless that statement is false, the motion must be denied. We find that paragraph 13(c) is not false, and Perdomo's claim to the contrary is based on a misunderstanding of the content of that paragraph.

Perdomo states that in paragraph 13(c), "the agent alleges that surveillance established that bags of crack and bags of money were carried into and out of 3046 Gunther Avenue." By dropping one key word from this sentence as it actually appears in the affidavit, Perdomo mischaracterizes the paragraph. Special Agent Mabray actually stated in paragraph 13(c) that surveillance had established that bags of *suspected* crack cocaine and money went in and out of the Gunther Avenue Premises.[1] This statement appears to be entirely accurate.

Paragraph 48, cited by Perdomo as support for his claim that paragraph 13(c) was misleading, reads [2]:

CI–4 indicated that he/she was with RODRIGUEZ when RODRIGUEZ collected approximately $7,000 in crack sales revenues from the Park Avenue and Intervale Avenue spots. CI–4 provided information that the money would be delivered later that day to REGO. Shortly after receiving that information, DEA agents positioned near the Gunther Avenue Premises observed REGO walk out of that residence,

---

1. Paragraph 13(c) of the warrant affidavit states in its entirety:

 3046 Gunther Avenue, Bronx, New York (hereinafter the "Gunther Avenue Premises"): Physical surveillance has established that bags of suspected vials of crack cocaine, and bags of money from sales of crack, have been carried

into and out of the Gunther Avenue Premises on numerous occasions.

2. In the search warrant and complaint affidavit, "Rego" refers to Carlos Enrique Perdomo; "Rodriguez" refers to the fugitive defendant Jose Miguel Rodriguez, a/k/a "Caballo."

get into a car and drive away. Approximately 15 minutes later, agents positioned near the bowling alley at 1215 East Gun Hill Road observed RODRIGUEZ and CI–4 arrive in the area in a blue Oldsmobile, and then, shortly thereafter, observed REGO drive alongside RODRIGUEZ's car; RODRIGUEZ then handed REGO a brown paper bag through the open windows of the cars; and the two cars drove away in different directions. Shortly thereafter, agents positioned near the Gunther Avenue Premises observed REGO park in the driveway of that residence and walk inside.

Although the affidavit does not report that the surveillance agents were able to see Perdomo carry the brown bag with him when he walked back into the Gunther Avenue Premises, it is a reasonable inference that the bag of $7,000 did not remain in the car.

Similarly, paragraph 51 of the warrant affidavit, also relied on by Perdomo to demonstrate that Paragraph 13(c) was misleading, reads: [3]

> 51. At approximately 3:18 p.m., DEA surveillance agents saw REGO leave the Gunther Avenue Premises and walk to a grey Chevrolet Celebrity. REGO was observed opening and then closing the trunk of that car before getting in and driving to the vicinity of 1215 East Gun Hill Road, across the street from the McDonald's. At approximately 3:40 p.m., JIMENEZ and RODRIGUEZ were observed arriving in a car at the same location. Agents saw JIMENEZ go to REGO's car, get in the front seat and hand a paper bag to REGO. REGO was then seen handing his car keys to JIMENEZ, who went to the trunk of REGO's car and removed a red sack. After getting back his car keys, REGO was observed driving to the Muliner Avenue Premises, which he entered carrying the paper bag he received from JIMENEZ.

Once again, although the affidavit does not report that the surveillance agents were able to see Perdomo carry the red sack out of the Gunther Avenue Premises, the fact that Per-

domo opened the trunk of the car (which is where the sack was shortly thereafter seen removed by Jose Urena, a/k/a "Jose Jimenez"), immediately after walking out of the house, plainly supports the reasonable inference that Perdomo carried the red sack out of the Gunther Avenue Premises.

Paragraph 56 of the search warrant affidavit, to which Perdomo also cites, reads, in pertinent part:

> 56. At approximately 2:30 p.m., DEA surveillance agents observed REGO walk out of the Gunther Avenue Premises carrying a large brown shopping bag. REGO got into a grey Chevrolet Celebrity. At approximately 2:42 p.m., surveillance agents saw REGO arrive at and enter Cruger Avenue. At approximately 2:45 p.m., agents observed JIMENEZ and RODRIGUEZ drive to and enter 3315 Cruger Avenue. Shortly thereafter, JIMENEZ, RODRIGUEZ and REGO walked out of 3315 Cruger Avenue.

Although defendant Perdomo concedes that in this instance the DEA did observe a bag being carried out of the Gunther Avenue Premises, he argues that the affidavit contains no information on the contents of the bag. (Perdomo Br., at 9). The flaw in defendant's argument is that he is viewing these details in isolation, and is seeking proof—rather than probable cause to believe—that the bag contained crack cocaine. For example, omitted from the defendant's analysis of paragraph 56 is any reference to the facts set forth elsewhere in the affidavit establishing that 3315 Cruger Avenue was probably a "stash" location for the crack organization. *See* Mabray Complaint Affidavit, paras. 13, 31, 34, 35, 36, 38–40, 56, 65, 68, 69, 77, 83, 105, 116, 120, 129, 131, 132, 134, 140, 148, 150, 151.

The surveillance described in paragraphs 48, 51 and 56, taken together with the other facts set forth in the warrant affidavit as a whole, support Special Agent Mabray's conclusion in paragraph 13(c).

---

**3.** In the search warrant and complaint affidavit, "JIMENEZ" refers to the fugitive defendant Jose Urena, a/k/a "Jose Jimenez." The lead defendant in this case—Luis Jimenez—is referred to in the complaint as "LUIS BELLO."

■ Even if Perdomo had made a substantial showing that paragraph 13(c) of the warrant affidavit contained a false statement, he has nevertheless failed to show that the allegedly false statement was made knowingly and intentionally or with reckless disregard for the truth.

Unsupported allegations that an affiant knowingly and intentionally made a false statement in his affidavit are insufficient. *See e.g., United States v. Shurn,* 849 F.2d 1090, 1096 (8th Cir.1988) (defendant's "bare allegations" unsupported by offers of proof do not warrant *Franks* hearing). *Compare United States v. Figueroa,* 750 F.2d 232, 237 (2d Cir.1984) (mere allegation that events described in affidavit did not take place does not satisfy substantial preliminary showing requirement) *with United States v. Ippolito,* 774 F.2d 1482, 1484 (9th Cir.1985) (agent told witness to refuse to testify so that necessity of wiretap could be demonstrated; government "did not seriously challenge the fact of intentional deception").

As the Supreme Court stated in *Franks v. Delaware,* "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978); *see also Rivera v. United States,* 728 F.Supp. 250 (S.D.N.Y.1990), *aff'd in part and vacated in part,* 928 F.2d 592 (2d Cir.1991). Moreover, "[a]llegations of negligence or innocent mistake are insufficient." *Id.; see also Ferguson,* 758 F.2d at 848; *Indiviglio v. United States,* 612 F.2d 624, 628 n. 5 (2d Cir.1979), *cert. denied,* 445 U.S. 933, 100 S.Ct. 1326, 63 L.Ed.2d 768 (1980). The Second Circuit emphasized in *United States v. Campino,* "*Franks* does not require that all statements in an affidavit be true; it simply requires that the statements be 'believed or appropriately accepted by the affiant as true.'" *United States v. Campino,* 890 F.2d 588, 592

(2d Cir.1989) (quoting *Franks v. Delaware,* 438 U.S. at 165, 98 S.Ct. at 2681), *cert. denied,* 498 U.S. 866, 111 S.Ct. 179, 112 L.Ed.2d 143 (1990). Thus, "it is one thing to say that an affiant falsely or recklessly stated facts from which he thereafter drew conclusions. It is quite another thing to say that the conclusions drawn from the facts fairly stated were falsely and recklessly made." *United States v. Gotti,* 771 F.Supp. 535, 539 (E.D.N.Y.1991).

Special Agent Mabray's statement that surveillance had established that bags of suspected crack cocaine and money went in and out of the Gunther Avenue Premises was a conclusion, appearing as it did in the overview section at the beginning of the affidavit. Indeed, the defendant acknowledges that the paragraph contains a conclusion, and not a recitation of facts. (Perdomo Br., at 7, 10–11). Nonetheless, on the basis of his different conclusion as to the meaning of paragraphs 48, 51 and 56 of the warrant affidavit, Perdomo maintains that Special Agent Mabray's conclusion was a deliberate falsehood or was made with reckless disregard for the truth. A defendant's submission of his own counter-interpretation of acts, however, does not satisfy the showing required for a *Franks* hearing. *See Campino,* 890 F.2d at 592 (affirmed denial of *Franks* hearing where defendants' claimed that facts did not support agents' belief about who used the searched premises; defendants failed to produce evidence of deliberate falsehood or recklessness); *United States v. Taft,* 769 F.Supp. 1295, 1309 (D.Vt.1991) (challenge to agent's statement of belief regarding where defendants would place marihuana plants rejected as going to weight and not recklessness); *United States v. Mims,* 812 F.2d 1068, 1074 (8th Cir.1987) (allegations that an agent misrepresented the true nature of recorded conversations does not rise to the level of "deliberate falsehood" or "reckless disregard for the truth" as required by *Franks* ).[4]

■ In any case, Paragraph 13(c) was not necessary to establish probable cause to

---

4. Further, even if Perdomo's conclusion is better supported by the facts in paragraphs 48, 51 and 56, which the Government disputes, Perdomo has failed to demonstrate that the conclusion set forth in paragraph 13(c) is the result of anything other than negligence or innocent mistake. On this basis, the defendant's request for a *Franks* hearing must be denied.

search the Gunther Avenue Premises. Indeed, even if Paragraph 13(c) had been omitted entirely from the search warrant affidavit, probable cause to search the Gunther Avenue Premises would have been amply established by the affidavit. Defendants are not entitled to suppression unless the allegedly false statements are material, *i.e.*, indispensable to a finding of probable cause. *Franks v. Delaware*, 438 U.S. at 155–56, 98 S.Ct. at 2676; *Levasseur*, 816 F.2d at 43; *United States v. Marin–Buitrago*, 734 F.2d 889, 895 (2d Cir.1984); *Gotti*, 771 F.Supp. at 540. As the Second Circuit has held, "[t]he ultimate inquiry on a motion to suppress is not—as defendants contend—whether the affidavit contains false allegations or material omissions, but whether after putting the challenged statements aside, there remains a residue of independent and lawful information sufficient to support probable cause." *Ferguson*, 758 F.2d at 849 (citing *United States v. Lace*, 669 F.2d 46, 48–49 (2d Cir.), *cert. denied*, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982)); *see also Levasseur*, 816 F.2d at 43 (defense motion must be denied without a hearing if allegedly false statements are not indispensable to probable cause).

■ In assessing whether probable cause supported the issuance of the warrant to search the defendant's residence, the Court must consider whether the application in support of the warrant minus the alleged false statement, contains two factual showings: "first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir.1983). Probable cause determinations involve an evaluation of the totality of the circumstances, *Illinois v. Gates*, 462 U.S. 213, 241, 103 S.Ct. 2317, 2333, 76 L.Ed.2d 527 (1983), and the facts "are not to be dissected and viewed singly ... [but] must be considered as a whole." *United States v. Oates*, 560 F.2d 45, 61 (2d Cir.1977) (citations omitted). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. at 232, 103 S.Ct. at 2329.

It is "a practical, non-technical conception," requiring only that "there be a fair probability that the premises will yield the objects specified in the search warrant." *Travisano*, 724 F.2d at 346; *see Illinois v. Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. This standard is one of "probability, and not a prima facie showing of criminal activity...." *Travisano*, 724 F.2d at 346; *United States v. Nersesian*, 824 F.2d 1294, 1306 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). Probable cause "need not be based on direct first-hand, or 'hard' evidence." *United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985).

Application of these principles here establishes that the affidavit set forth ample probable cause to search the Gunther Avenue Premises. As demonstrated in the Government's Memorandum, 40–48, the warrant application recited details about surveillance involving the Gunther Avenue Premises on three separate days. In addition, the warrant affidavit set forth numerous related facts evidencing defendant Perdomo's involvement in the trafficking of crack cocaine and his significant role within the Bello organization.

When viewed together, (i) the observations set forth in paragraphs 48, 51 and 56 of the surveillance involving the Gunther Avenue Premises, (ii) the involvement of Perdomo in the organization's daily operation and the pattern of meetings and exchange of packages described throughout the warrant affidavit, (iii) the first-hand information about the crack organization's operations from confidential informants, and (iv) the extent of those operations as confirmed by the wiretap, provided ample probable cause to believe that a crime was being committed and that evidence of that crime was to be found at the Gunther Avenue Premises. The alleged misstatement in paragraph 13(c) did not change this. Accordingly, no hearing is required.

### PRETRIAL HEARING TO DETERMINE THE ADMISSIBILITY OF THE WEAPONS EVIDENCE

Perdomo's speculation that the Government does not have sufficient evidence to

support a conviction under 18 U.S.C. § 924(c) is not grounds for a pretrial hearing. If the Government is not able to establish a *prima facie* case, then Perdomo would be in a position to move to dismiss the charges, after trial, pursuant to Fed.R.Crim.P. 29.

Perdomo, as noted, also moves for a separate trial with respect to Count Thirteen of the superseding indictment. Count Thirteen charges the defendant with possession of a machine gun. Perdomo's sole basis for this motion is his claim that the Government cannot establish, as required for conviction under Title 18, United States Code, Section 924(c), that the weapons seized during the search of his residence—including the machine gun referred to in Count Thirteen—were "used or carried" during and in relation to a narcotics offense. Should the defendant prevail on its Rule 29 motion with respect to the Section 924(c) charges, the Government has consented not to submit the Section 922(*o*) charge to the jury.

### DEMANDS FOR BILLS OF PARTICULARS

■ Because a bill of particulars serves merely to inform a defendant of the nature of the charge, it is not to be used as a general investigative tool for the defense, *United States v. Salazar*, 485 F.2d 1272, 1277–78 (2d Cir.1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); *United States v. Mannino*, 480 F.Supp. 1182, 1185 (S.D.N.Y. 1979); *United States v. Leonelli*, 428 F.Supp. 880, 882 (S.D.N.Y.1977), as a device to compel disclosure of the Government's evidence or its legal theory prior to trial, *Torres*, 901 F.2d at 234; *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir.1974); *United States v. Lebron*, 222 F.2d 531, 535–36 (2d Cir.), *cert. denied*, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955), or to foreclose the Government from using proof it may develop as the trial approaches. *United States v. Malinsky*, 19 F.R.D. 426, 428 (S.D.N.Y.1956).

■ Accordingly, the Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories, *United States v. Torres*, 901 F.2d at 233–34; *United States v. Andrews*, 381 F.2d 377, 377–78 (2d Cir.1967), *cert. denied*, 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968); *United States v. Wilson*, 565 F.Supp. 1416, 1439 (S.D.N.Y.1983), *aff'd*, 750 F.2d 7 (2d Cir.1984), lest the defendant tailor his testimony to explain away the Government's case. *United States v. Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y.1962), *aff'd*, 321 F.2d 509 (2d Cir.1963), *cert. denied*, 375 U.S. 974, 84 S.Ct. 491, 11 L.Ed.2d 418 (1964).

■ Certain of the defendants' requests seek further specifics of the particular acts they are alleged to have participated in or for which they are being held responsible.

Such requests are improper. *See United States v. Cephas*, 937 F.2d 816 (2d Cir.1991); *United States v. Shoher*, 555 F.Supp. 346, 350 (S.D.N.Y.1983); *United States v. Politi*, 334 F.Supp. 1318, 1321 (S.D.N.Y.1971); *United States v. Garcia*, 272 F.Supp. 286, 289 (S.D.N.Y.1967).

■ The defendants also request the "whens" "wheres" and "with whoms" of acts and participation in the charged conspiracy. Pretrial motions for such information are routinely denied. *United States v. Lavin*, 504 F.Supp. 1356, 1362 (N.D.Ill.1981); *United States v. Agnello*, 367 F.Supp. 444, 450–51 (E.D.N.Y.1973); *United States v. Iannelli*, 53 F.R.D. 482, 483 (S.D.N.Y.1971) (citation omitted); *Malinsky*, 19 F.R.D. at 428. Furthermore, disclosure of all the overt acts in furtherance of the conspiracy (*see* Montoya Br. at 5), is not properly the function of a bill of particulars. *United States v. Hayward*, 271 F.Supp. 203, 204 (S.D.N.Y.1967); *United States v. Tucker*, 262 F.Supp. 305, 307 (S.D.N.Y.1966). Defendants' requests for particulars in these categories must be denied.

The superseding indictment in this case is rather detailed. Although federal law does not require the indictment to charge, or the Government to prove, a single overt act in furtherance of a narcotics conspiracy, *United States v. Knuckles*, 581 F.2d 305, 311 (2d Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States v. Bermudez*, 526 F.2d 89, 94 (2d Cir.1975), *cert.*

*denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976), Indictment S1 92 Cr. 550 sets forth 24 overt acts in the conspiracy count, and also sets out, in the "Means and Methods" section of Count One, allegations as to the roles of the defendants in the conspiracy, locations used by the conspiracy, and the nature of the conspiracy charged. The Indictment also alleges, in separate counts, three substantive violations of the narcotics statute.

■ In addition, the Government has provided wiretap applications, a search warrant affidavit, various complaints filed in connection with this case, draft transcripts of the tape recorded conversations it intends to use at trial, copies of the tape recordings themselves, reports containing details of the narcotics and non-narcotics seizures in the case and other discovery. A bill of particulars is not required where, as in this case, information properly the subject of a bill of particulars is available from other sources, such as discovery materials, voluntary disclosure by the government, other proceedings or the indictment itself. *See, e.g., Panza,* 750 F.2d at 1148; *Feola,* 651 F.Supp. at 1133.

■ The Indictment, complaints and pretrial discovery are more than adequate to prevent the defendants from being unfairly surprised and to inform them of the charges. Accordingly, the defendants' motions for bills of particulars is denied.

## DEMANDS FOR THE IDENTITIES OF INFORMANTS

With regard to the defendants' requests for the identities of the informants, the Government has stated its present intention to call the confidential informants as witnesses at trial.

■ None of the defendants, however, has demonstrated why the Government should be required to disclose the informants' identities before trial. The defendant bears the burden of establishing the need for disclosure of an informant's identity. *United*

*States v. Lilla,* 699 F.2d 99, 105 (2d Cir.1983); *United States v. Manley,* 632 F.2d 978, 985 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). The Government's privilege to withhold an informant's identity gives way only where his or her identity is "relevant and helpful to the defense of the accused or is essential to a fair determination" of the defendant's case. *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957). Before disclosure may be ordered, the defendant must demonstrate that the informant's testimony is material to the defense. *United States v. Saa,* 859 F.2d 1067, 1073 (2d Cir.), *cert. denied,* 489 U.S. 1089, 109 S.Ct. 1555, 103 L.Ed.2d 858 (1988) ("[D]isclosure of the identity or address of a confidential informant is not required unless the informant's testimony is shown to be *material to the defense.*") (emphasis added); *see United States v. Russotti,* 746 F.2d 945, 949 (2d Cir.1984) ("essential to defense") (quoting *Scher v. United States,* 305 U.S. 251, 254, 59 S.Ct. 174, 176, 83 L.Ed. 151 (1938)); *United States v. Jimenez,* 789 F.2d 167, 170 (2d Cir.1986) (same).[5]

■ With regard to this showing, it is not sufficient that the informant may have been a witness to, or a participant in, the crimes charged. *See United States v. Saa,* 859 F.2d at 1073. Thus, in *United States v. Jimenez,* 789 F.2d 167, 170 (2d Cir.1986), the informant was a participant in and witness to the crime, but the defendant was not entitled to disclosure because the defendant had failed to show that the testimony of the informant "would have been of even marginal value to the defendant's case." *Id.* Additionally, even a showing that a confidential informant could cast doubt on the general credibility of the Government's witnesses is "normally an insufficient basis to overcome the informant's privilege." *United States v. Russotti,* 746 F.2d 945, 950 (2d Cir.1984); *see also United States v. Hyatt,* 565 F.2d 229, 231–32 (2d Cir.1977) (refusal to compel pretrial disclosure of informant's identity and whereabouts

---

**5.** Even at trial, the Government may refuse to disclose the identities of its informants in some circumstances. *See McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *United States v. Van Orsdell,* 521 F.2d 1323 (2d Cir.1975), *cert. denied,* 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976).

not error, because it was not clear before trial that the informant's testimony would be helpful to the defense or essential to a fair trial; moreover, any error was cured when the government disclosed the informant's identity at the close of defendant's direct testimony). "Mere speculation ... that the informant may possibly be of some assistance does not overcome the strong public interest in protecting informants." *United States v. Martinez,* 634 F.Supp. 1144, 1150 (S.D.N.Y. 1986).

 The defendants have made no showing as to how the confidential informants' testimony would be at all material to their defenses. The defendant Cuevas does not explain how the informants' testimony would be material to his defense. *See* Memorandum of Law in Support of Omnibus Motion, submitted on behalf of Moises Cuevas ("Cuevas Br."), at 5. The defendant St. Hilare, who, prior to his arrest, was identified by CI–2 and CI–4 as a principal lieutenant of Luis Jimenez during part of the time of the charged conspiracy, speculates that perhaps the other two informants named in the complaint might not testify that St. Hilare was a lieutenant in the Bello organization. *See* Letter of Robert L. Herbst, Esq. to the Court, dated January 14, 1993, on support of defendant Usmare St. Hilare ("St. Hilare Br."), at 4–5. This kind of speculation, as to the knowledge base of the other two informants and what their testimony might be, is insufficient to warrant the pretrial exposure of these informant's identities.[6] Pretrial exposure of the identities of these two informants, on the basis of St. Hilare's speculation, is made all the more unnecessary by the Government's intention to call the informants as witnesses.

The presumption in favor of preserving the confidentiality of informants' identities is particularly relevant to a narcotics case in which an arsenal of firearms was seized from locations controlled by the charged defendants. "Especially in narcotics cases, where the dangers of witness intimidation, subornation of perjury or actual injury to witnesses are great, the defendant's request for a witness list should not be granted absent a particularized showing of need." *United States v. Taylor,* 707 F.Supp. 696, 703 (S.D.N.Y.1989), (citing *United States v. Feola,* 651 F.Supp. 1068, 1138 (S.D.N.Y.1987), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989).

The Government's interest in protecting the confidential informants' safety before trial outweighs the defendant's generalized, and unsupported, statement of need to learn the informants' identities weeks, and possibly months, before trial.[7]

---

6. We note that as to one of these informants—CI–3—the complaint makes clear that the informant's involvement was limited to assisting in two monitored purchase of narcotics and a brief conversation with the defendant Raymond Comas, *see* Complaint at 4, 15–17. As to both of these informants, the Government recognizes that it would be obligated under *Brady* principles to disclose the identities of the informants if they possess exculpatory information with regard to any of the defendants.

7. The Second Circuit cases cited by the defendants do not support their position. In *Saa, supra,* the Court specifically held that as to two of the defendants in the case, disclosure of the identity of the confidential informant was not necessary even at trial because these defendants had made "no showing that [the informant's] testimony was material to their defense." *Id.* at 1073. Based on the content of their motion papers, the defendants are in no different position than were these two *Saa* defendants since they identify no defense to which the confidential informants' testimony might relate. As to the third *Saa* defendant, the Court ruled that disclosure should have occurred after two government witnesses contradicted one another in their *trial* testimony regarding whether the defendant was present in a particular, relevant location at a particular, relevant time. *See Id.* at 1073–74. At that point, the defendant Saa could identify the relevance of the informant's identity (and possible testimony) to her defense, and disclosure of the informant's identity, to permit the defendant to attempt to interview the informant before deciding whether to call him as a witness, was appropriate. Because, here, the informants' identities will be made available at trial, and the defendant will have ample opportunity at that point to attempt to interview the informants to determine whether to call them as defense witnesses, this part of the *Saa* holding is inapposite. *United States v. Roberts,* 388 F.2d 646, 648–49 (2d Cir.1968) (*see* Cuevas Br., at 5), concerned disclosure of the confidential informant's identity *at trial.*

### DEMANDS FOR IDENTITIES OF EXPERT WITNESSES

 The defendants also seek the identities of any expert witnesses the Government may call and any reports the witnesses have prepared. The defendants seek this information in reliance on a case—*United States v. Fuentes*, 563 F.2d 527, 533 (2d Cir.1977) (*see* Cuevas Br., at 4)—which appears to bear no relation to the proposition for which it is cited. The general rule is that the Government is not required to produce a witness list before trial. *See United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir.), *cert. denied*, 498 U.S. 921, 111 S.Ct. 299, 112 L.Ed.2d 252 (1990); *United States v. Higgs*, 713 F.2d 39, 43–44 (3d Cir.1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984).[8] Nor has the defendant made the required showing for a witness list. In *United States v. Cannone*, 528 F.2d 296 (2d Cir.1975), the Second Circuit held that a defendant is not entitled to a witness list from the Government unless he makes "a specific showing that disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case." *Id.* at 301; *see also United States v. Bejasa*, 904 F.2d at 139–40. A mere "abstract conclusory claim that such disclosure [is] necessary to [the] proper preparation for trial," like the claim here, is insufficient. *See Id.* at 301–02 (abuse of the trial court's discretion to grant a defense motion for a witness list supported by a general statement of need).

The Government has advised that during jury selection it will provide the Court and counsel with a witness list and will identify any expert witnesses on the list. We are further advised that no expert of the kind described by the defendants will be called as a witness during the first two to three weeks of trial. Accordingly, the defendants will have adequate time to prepare for cross examination. Moreover, to expedite the trial, the Government has agreed to produce copies of any final reports prepared by expert witnesses when such reports are received.

### THE SEVERANCE MOTIONS

Defendants Perdomo, St. Hilare, Cuevas and Montoya move for discretionary severance pursuant to Fed.R.Crim.P. 14, citing a variety of bases, including the concerns enunciated in *United States v. Casamento*, alleged prejudicial spillover and alleged disparity of evidence.

Severance motions under Fed.R.Crim.P. 14 are addressed to the discretion of the District Court. *E.g., Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. LaSanta*, 978 F.2d 1300, 1308 (2d Cir.1992); *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir.1988); *United States v. Rucker*, 586 F.2d 899, 902 (2d Cir.1978); *United States v. Taylor*, 562 F.2d 1345, 1362 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). "[D]enial of such a motion will be reversed only upon a showing of clear abuse of that discretion." *United States v. Chang An–Lo*, 851 F.2d 547, 556 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988) (citing cases).

Judicial economy is the primary factor to be considered by the district court in the exercise of this discretion. Even assuming that a particular defendant is somehow prejudiced by joinder, the issue under Fed. R.Crim.P. 14 is whether the prejudice " 'is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials.' " *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir.) (quoting *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir.1984)), *cert. denied*, 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986); *see also United States v. Corr*, 543 F.2d 1042, 1052 (2d Cir.1976); *Lyles*, 593 F.2d at 191; *United States v. Gorecki*, 813 F.2d 40, 42 (3d Cir. 1987). The risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits. *United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir.1980); *see also United States v.*

---

**8.** Indeed, the Conference Committee that reconciled conflicting House and Senate versions of proposed Rule 16 expressly rejected the House version that would have required pretrial disclosure of the names and addresses of other party's witnesses. *See* Conference Committee Notes, H.Rep. 94-414, Rule 16, para. (C).

*Lyles,* 593 F.2d 182, 191 (2d Cir.1979) (presumption in favor of joint trials "conserves judicial resources, alleviates the burden of citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials") (quoting *United States v. Borelli,* 435 F.2d 500, 502 (2d Cir. 1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971). Indeed, with respect to cases precisely like the one at bar, the Supreme Court has reaffirmed the powerful institutional considerations underlying the settled rule that defendants who are indicted together ordinarily should be tried together:

> Many joint trials—for example, those involving large conspiracies to import and distribute illegal drugs—involve a dozen or more codefendants.... It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability— advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts. *Richardson v. Marsh,* 481 U.S. 200, 209–210, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987).

 The standards to be met by a defendant seeking to justify the tremendous burdens separate trials create for the criminal justice system are imposing ones. They require a showing that the defendant would be so prejudiced by the joinder that denial of a constitutionally fair trial would result. *United States v. Burke,* 700 F.2d 70, 83 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); · *United States v. Cunningham,* 723 F.2d 217, 230 (2d Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984); *Rucker,* 586 F.2d at 902; *United States v. Herrera,* 584 F.2d 1137,

1143 (2d Cir.1978). "It is well settled that the fact that in a joint trial there will be evidence against one defendant which is not evidence against another defendant does not require separate trials." *Hanger v. United States,* 398 F.2d 91, 100 (8th Cir.1968), *cert. denied,* 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969) (quoting *Rizzo v. United States,* 304 F.2d 810, 818 (8th Cir.), *cert. denied,* 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962)).

 Moreover, merely establishing that a defendant would have a better chance for acquittal at a separate trial is not sufficient to make the required showing of substantial prejudice. *United States v. Carson,* 702 F.2d 351, 366 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983); *United States v. Werner,* 620 F.2d 922, 928 (2d Cir.1980); *United States v. Magnano,* 543 F.2d 431, 435 n. 2 (2d Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977); *United States v. DeSapio,* 435 F.2d 272, 280 (2d Cir.1970), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); *Borelli,* 435 F.2d at 502. Rather, to prevail, a defendant must establish that a "miscarriage of justice" will occur. *United States v. Nersesian,* 824 F.2d 1294, 1303 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987); *United States v. Bari,* 750 F.2d 1169, 1177 (2d Cir. 1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

 None of the moving parties has met these stringent standards. Each seeks a severance based on the considerations set forth in *United States v. Casamento,* 887 F.2d 1141 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). In *Casamento,* the Second Circuit held that in the rare case where a proposed trial is expected to last more than four months *and* is to involve more than ten defendants, the district court should carefully consider the advisability of proceeding by way of a single trial. *Casamento* does not apply to this case, as we fully expect that the number of defendants standing trial will not exceed the parameters set forth there. ·

Furthermore, the Government estimates that trial of this case will take three months or less. Thus, because the trial is likely to involve ten defendants or less and will likely take less than four months, the concerns enunciated in *Casamento* are inapplicable.

We further observe that despite defendants' repeated references to a "mega-trial", this case in no way approaches the magnitude or the complexity of proof in *Casamento*. We are assured by the Government that this case does not involve the complex evidence of massive money laundering transactions and other circumstantial proof, or the number of complex criminal charges and diverse counts contained in the *Casamento* indictment. The 13 counts of this indictment [9] charge violations only of the narcotics and firearms laws, all of which charges arise out of the criminal activity of a single narcotics organization which operated in the Bronx over an approximately two year period.

Each of the moving defendants also seeks severance based upon various claims of prejudicial spillover and disparity of evidence. Defendants Perdomo and Montoya claim that they had a lesser role in the conspiracy. (Perdomo Br. at 19; Montoya Br. at 7–8). Defendants Perdomo and St. Hilare claim that most of the Government's evidence will not relate to them, and defendant St. Hilare points out that his voice was not recorded during the wiretap. (Perdomo Br. at 19; St. Hilare Br., at 4). The defendants point out that they are not charged with any of the firearms and continuing criminal enterprise counts, and therefore claim that they should be tried separately from these defendants who are charged with those offenses. (St. Hilare Br., at 3; Cuevas Br., at 7; Montoya Br. at 7–8). Each of these claims is insufficient to justify severance.

The Government states that it expects to prove at trial that the defendants Montoya and St. Hilare were major, not minor, participants in the Bello organization. In any event, claims by defendants as to their minor role in relation to other coconspirators, and the disparity in the quantity of evidence they anticipate will be offered against them, even if credited, do not, without more, require severance. The Second Circuit recently stated, "disparity in the quantity of evidence and of proof of culpability are inevitable in any multidefendant trial, and by themselves do not warrant a severance." *United States v. Cardascia,* 951 F.2d 474, 482 (2d Cir.1991); *see Chang An–Lo,* 851 F.2d at 557; *Carson,* 702 F.2d at 366. Although there may be "differences in degree of guilt and possibly notoriety" of the defendants, that is not sufficient grounds for separate trials. *United States v. Aloi,* 511 F.2d 585, 598 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); *see also Torres,* 901 F.2d at 230; *Nersesian,* 824 F.2d at 1304.

Furthermore, even if a separate trial were granted, the fact that the severed defendants played comparatively lesser roles in the charged conspiracy does not mean that evidence showing the full scope and true nature of the enterprise cannot properly be admitted against each defendant. *See United States v. Vega,* 458 F.2d 1234, 1236 (2d Cir.1972), *cert. denied,* 410 U.S. 982, 93 S.Ct. 1506, 36 L.Ed.2d 177 (1973). Indeed, where, as here, each defendant is a member of a single narcotics conspiracy, virtually all of the evidence admitted at a joint trial would be admissible against each separate defendant in a separate trial as acts of his coconspirators in furtherance of the charged conspiracy. *Casamento,* 887 F.2d at 1153; *see also Bari,* 750 F.2d at 1178; *Cunningham,* 723 F.2d at 230; *United States v. Angelilli,* 660 F.2d 23, 37–38 (2d Cir.1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982); Fed.Rules Evid.Rule 801(d)(2)(E). Accordingly, attempts by the moving defendants to diminish the signifi-

---

9. The Government asserts that it would appear likely that of the thirteen counts in the superseding indictment, only eight counts will be tried. Counts Three and Four each charge a fugitive defendant with violating the continuing criminal enterprise statute, Title 21, United States Code, Section 848(a). Count Five charges a fugitive defendant with a substantive narcotics law violation. Count Ten charges a fugitive defendant with using and carrying a firearm during and in relation to a drug trafficking offense, in violation of Title 18, United States Code, Sections 924(c)(1) and 2. Unless the fugitives named in these counts are apprehended soon, they will not be tried in this case. Count Nine charges a defendant who has pleaded guilty.

cance of their roles in this case appear to be unavailing.

Each of the moving defendants is charged with being a member of a single narcotics conspiracy. While it is true that a large portion of the evidence in this case will consist of wiretap evidence, the fact that defendant St. Hilare was not recorded during the wiretap does not mean that he could exclude that evidence at a separate trial. His premise (and that of the other moving defendants) that only evidence directly involving him would be admissible in a separate trial is untenable.

██ For similar reasons, the claims of defendants St. Hilare, Cuevas and Montoya concerning "spillover evidence" from the firearms and CCE offenses with which they are not charged, are unavailing. "Where 'spillover evidence' is alleged as the grounds for Rule 14 severance, the defendant's burden is heavy." *United States v. Alegria,* 761 F.Supp. 308, 310–11 (S.D.N.Y.1991); *see also United States v. Villegas,* 899 F.2d 1324, 1347 (2d Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990). A properly joined defendant is not entitled to a separate trial merely because there will be testimony relating to other criminal activities of his codefendants. *E.g., United States v. Weisman,* 624 F.2d 1118, 1129 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *Rucker,* 586 F.2d at 902. Otherwise, the policies behind Rule 8 governing joinder of defendants and charges would be undermined. *Werner,* 620 F.2d at 929. The law is clear that merely because some evidence introduced at trial can be considered only as against one defendant or another does not make out substantial prejudice justifying severance because proper limiting instructions will reduce any resultant prejudice. *See, e.g., LaSanta,* 978 F.2d at 1307; *Cardascia,* 951 F.2d at 483–84; *Torres,* 901 F.2d at 230; *United States v. Brown,* 744 F.Supp. 558, 561 (S.D.N.Y.1990); *United States v. Victor Teicher & Co.,* 726 F.Supp. 1424, 1439 (S.D.N.Y.1989).

██ The substantive narcotics, CCE and firearms counts in which St. Hilare, Cuevas and Montoya are not named all arose from and are connected to the narcotics conspiracy with which they are charged. Thus, even if severance were granted, evidence of the substantive charges presented at a joint trial could also be used at separate trials against these defendants. A defendant who knowingly joins a conspiracy "need not be a member of the conspiracy from its inception but may join later and incur liability for the conspiracy's unlawful acts committed both before and after his adoption of the conspiracy." *United States v. Guillette,* 547 F.2d 743, 751 (2d Cir.1976), *cert. denied,* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977); *see also United States v. Blackmon,* 839 F.2d 900, 911 (2d Cir.1988); *United States v. Ebner,* 782 F.2d 1120, 1127 (2d Cir.1986). Evidence of possession of firearms is admissible to prove a charge of a narcotics conspiracy, firearms being tools of the narcotics trade. *See Casamento,* 887 F.2d at 1165; *United States v. Rivera,* 844 F.2d 916 (2d Cir.1988); *United States v. Crespo,* 834 F.2d 267, 271 (2d Cir. 1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988); *United States v. Fernandez,* 829 F.2d 363, 367 (2d Cir.1987).

The defendants have failed to justify the tremendous burdens that separate trials impose on the criminal justice system. Their motions for severance are, accordingly, denied.

### THE "MEANS AND METHODS" SECTION OF THE INDICTMENT

██ Defendant Perdomo moves to strike the "Means and Methods" section of Count One of the superseding indictment on the ground that it "constitutes surplusage" and is "unfairly prejudicial" (Perdomo Br. at 21). The defendant Daniel Urena joins in the motion.

"It has long been the policy of courts within the Southern District to refrain from tampering with indictments." *United States v. Claytor,* 52 F.R.D. 360, 361 (S.D.N.Y.1971). As defendant Perdomo candidly admits, motions to strike supposed surplusage are rarely granted. (Perdomo Br. at 22). *See United States v. Napolitano,* 552 F.Supp. 465, 480 (S.D.N.Y.1982) (citing Wright, *Federal Practice and Procedure,* § 127, at 278 n. 15 (1969), and *United States v. DePalma,* 461 F.Supp. 778, 797 (S.D.N.Y.1978)).

Further, "[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial.'" *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir.1990); *see also Napolitano*, 552 F.Supp. at 480; *Claytor*, 52 F.R.D. at 361; *United States v. Pilnick*, 267 F.Supp. 791, 802 (S.D.N.Y.1967); *United States v. Klein*, 124 F.Supp. 476, 479–80 (S.D.N.Y.1954); Fed.R.Crim.P. 7, Advisory Committee Notes. That standard is an exacting one. *Napolitano*, 552 F.Supp. at 480.

The question, moreover, is not whether there is language that might be viewed as prejudicial, but whether that language is also relevant to the crimes charged. As Judge Sweet explained in *Napolitano*:

> The determinative question in a motion to strike surplusage is not the potential prejudice, but rather the relevance of the allegation to the crime charged in the indictment. If the evidence of the allegation is admissible and relevant to the charge, then despite prejudice, the language will not be stricken. *United States v. Chas. Pfizer & Co.*, 217 F.Supp. 199, 201 (S.D.N.Y.1963).

552 F.Supp. at 480; *see also Scarpa, supra,* 913 F.2d at 1013 (" '[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken' ") (quoting *DePalma*, 461 F.Supp. at 797).

Here, the challenged section is relevant to the conspiracy crime charged. The "Means and Methods" section of Count One explains the alleged structure of the conspiracy and the alleged roles each defendant held within the organization. Evidence of the allegations contained in the "Means and Methods" section will certainly be relevant and admissible with respect to the conspiracy charge. Moreover, the "Means and Methods" section is drafted in neutral and non-inflammatory language.

Although the defendants claim that the description of the conspiracy contained in that section is not essential to the conspiracy charge, "[t]he short answer is that an indictment need not be limited to statements specifying the elements charged but may, and generally does, describe the nature of the conspiracy charged and enumerate overt acts." *United States v. Wheaton*, 463 F.Supp. 1073, 1077 (S.D.N.Y.) *aff'd sub nom. United States v. Williams*, 614 F.2d 1293 (2d Cir.1979).

Accordingly, because the defendants have failed to meet the "exacting standard" needed to strike surplusage, their motions are denied.[10]

### THE RULE 404(B) EVIDENCE

The defendant Cuevas demands to be notified of any evidence that the Government may offer pursuant to Rule 404(b) of the Federal Rules of Evidence. The defendant St. Hilare joins in this motion. The Government advises that it has no intentions of offering Rule 404(b) evidence with respect to these two defendants, but counsel will be notified promptly if the Government's intentions change.

### THE ADEQUACY OF ST. HILARE'S ARREST

■ The defendant Usmare St. Hilare moves to suppress the tangible evidence seized from his person on the ground that his arrest was not supported by probable cause. St. Hilare does not request a hearing, but contends that the complaint against him did not contain allegations which amounted to probable cause to arrest. St. Hilare Br., at 5–6.

"Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Calamia v. The City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989). *Accord United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983); *United States v. Ginsberg*, 758 F.2d 823, 828 (2d Cir.1985). "Probable cause requires only a probability

---

10. We note that the Government does not object to the suggestion of the defendant Perdomo that the "Means and Methods" section of Count One of the indictment be read to the jury only after the close of the evidence. We invite the defendant to make such a motion at the appropriate point in jury selection.

or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). As the Second Circuit stated in *United States v. Cruz:*

> [i]n order to establish probable cause, it is not necessary to make a "prima facie showing of criminal activity" or to demonstrate that it is more probable than not that a crime has been or is being committed. Rather, probable cause for arrest "exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." It " 'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " 834 F.2d 47, 50–51 (2d Cir.1987) (citations omitted).

On the basis of the complaint against St. Hilare dated June 18, 1992 which incorporated by reference the complaint affidavit of DEA Special Agent Mabray, probable cause to arrest St. Hilare was more than adequately established. Paragraphs 7 and 8 of the complaint reads as follows:

> "7. During the evening of June 17, 1992, I and other agents observed [the defendant St. Hilare] and [the defendant Daniel Urena] walk out of 3315 Cruger Avenue carrying three or four large dark plastic bags similar to those seized today at 3046 Gunther Avenue, where several pounds of crack, vials of crack, firearms and various pieces of narcotics paraphernalia were also seized; they put the bags down next to a Chevrolet Impala Car; several minutes later [the defendant Luis Jimenez, a/k/a "Bello"] walked out of 3315 Cruger Avenue, joined [St. Hilare and Daniel Urena], and the three men then loaded the plastic bags into the trunk of the Impala. While this was happening, agents observed [the defendant Jose Urena, a/k/a "Jose Jimenez,"] in a car on the street. The Chevrolet Impala was observed late in the evening parked in front of 975 Intervale Avenue, Bronx, New York, one of the Bello organization's primary crack distribution locations. When [St. Hilare] was arrested today, he was in the same Chevrolet Impala as referred to above.

> 8. CI–2 has informed me that during the latter part of 1990, [St. Hilare] was one of [Jimenez's] main lieutenants. Specifically, CI–2 told me that on numerous occasions, he/she was with [St. Hilare] when he gave crack sales proceeds to [Jimenez]. In addition, CI–2 has told me that [St. Hilare] was responsible for supplying crack to the Intervale and Park Avenue spots. I have also been informed by CI–4 independently that [St. Hilare] has acted in the past as one of [Jimenez's] main lieutenants."

Thus, in substance, the complaint alleged that:

1. Two informants, whose reliability was demonstrated in the course of the investigation of the Bello organization, *see generally* Mabray Complaint Affidavit, independently identified St. Hilare as a former principal lieutenant of the suspected leader of the Bello organization.

2. On the night before his arrest, St. Hilare was observed walking out of 3315 Cruger Avenue—a building which had been established as a suspected stash location used by the Bello organization. *See* Mabray Complaint Affidavit, paras. 13, 31, 34, 35, 36, 38–40, 56, 65, 68, 69, 77, 83, 105, 116, 120, 129, 131, 132, 134, 140, 148, 150, 151.

3. On the night before his arrest, St. Hilare was present in front of 3315 Cruger Avenue with the leader of the Bello Organization and a second suspected member of the organization—both of whom, through the wiretap, had been overheard and recorded in suspected criminal conversations. All three men were loading plastic bags into a car which was later parked in front of one of the two principal crack distribution locations of the organization.

4. While these bags were being loaded, a second high-level member of the Bello orga-

372

nization was sitting in a second car parked nearby.

5. The bags which were loaded into the car by St. Hilare and his alleged confederates resembled bags seized at 3046 Gunther Avenue, a second Bello organization site, and at this second site a large quantity of crack, firearms, and narcotics paraphernalia were seized the following morning.

6. The following morning, St. Hilare was driving the same car in which St. Hilare and his alleged confederates had placed the bags during the previous evening.

■ These allegations established probable cause for St. Hilare's arrest. It is the law in federal courts that the testimony of an accomplice may be enough in itself for conviction, provided such testimony is believed by the jury beyond a reasonable doubt. Sand, *Modern Federal Jury Instruction*, Instr. 7–5; *United States v. Bernstein*, 533 F.2d 775, 791 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976); *United States v. Messina*, 481 F.2d 878, 881 (2d Cir.), *cert. denied*, 414 U.S. 974, 94 S.Ct. 286, 38 L.Ed.2d 217 (1973); *United States v. Projansky*, 465 F.2d 123, 136–37 n. 25 (2d Cir.), *cert. denied*, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972). It follows that the allegations of reliable informants such as CI–2 and CI–4 are sufficient to satisfy the much lower threshold of probable cause to arrest. The surveillance observations set forth in the complaint augmented the probable cause for St. Hilare's arrest by establishing (i) his continuing relationship with members and the leader of the Bello organization, and (ii) his participation in suspected criminal activity, to wit, the transfer of bags of narcotics or narcotics related materials from 3315 Cruger Avenue to 975 Intervale Avenue. The confluence of the reliable informants' allegations and these surveillance observations, in the context of the Government's investigation of the Bello organization as a whole, certainly amounted to " 'facts and circumstances within [the agents'] knowledge and of which they had reasonably trustworthy information ... to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *United States v. Cruz*, 834 F.2d 47, 50–51 (2d Cir.1987); *See United States v. Lisznyai*, 470 F.2d 707, 709 n. 6 (2d Cir.1972), *cert. denied*, 410 U.S. 987, 93 S.Ct. 1516, 36 L.Ed.2d 184 (1973). St. Hilare's motion is therefore denied.

All other motions are denied for reasons set forth in the Government's papers, and accordingly, the relief sought by defendants in the pending pretrial motions is in all respects denied.

SO ORDERED.